J. Robert **BONNAR** et al.

v.

The **UNITED STATES.**

No. 293–63.

United States Court of Claims.

Feb. 19, 1971.

Skelton, J., dissented and filed opinion in which Nichols, J., joined.

J. Frederic Taylor, New York City, attorney of record, and Coleman Burke, New York City, for plaintiffs. Burke & Burke, New York City, and Armin R. St. George, Washington, D. C., of counsel.

Robert R. Donlan, Washington, D. C., with whom was Asst. Atty. Gen. William D. Ruckelshaus, for defendant, Mary M. Schroeder, Washington, D. C., of counsel.

Before COWEN, Chief Judge, JONES, Senior Judge, and LARAMORE, DURFEE, COLLINS, SKELTON and NICHOLS, Judges.

## OPINION

DURFEE, Judge.[*]

Plaintiffs, as citizens of the United States, are former stockholders or successors in interest to former stockholders of the General Dyestuff Corporation of New York (GDC). In 1942, during the war with Germany, the stock of this company was vested or seized by the Alien Property Custodian [1] of the United States under the Trading With the Enemy Act § 1 et seq. (1964).

Under the Trading With the Enemy Act, the U. S. Alien Property Custodian (APC) in 1942 also vested title in the stock of General Aniline & Film Corporation (GAF), another American company engaged in the manufacturing of dyestuffs, chemicals and other products, and assumed titular control thereof.

In 1954, after an exchange of stock, the U. S. Attorney General merged GDC into GAF. In 1965, the Attorney General sold the GAF common stock for over $329,000,000. The allocable portion of these proceeds now claimed by plaintiffs in this litigation is $22,227,483.15, with interest thereon from March 1965, when the Attorney General sold the GAF stock.

Although a settlement of an earlier suit by plaintiffs in the United States District Court was effected in 1945 and 1951, these settlements and accompanying releases constitute no prohibition to the present action. Section 42(a) of the Trading With the Enemy Act confers jurisdiction on this court to hear and render judgment on these plaintiffs' claims "[N]otwithstanding any statute of limitation, lapse of time, any prior decision by any court of the United States, or any compromise, release or assignment to the Alien Property Custodian, * * *."

Defendant has attempted to place the responsibility for unusual delay in this long protracted litigation upon plaintiffs. The original bill enabling plaintiffs to sue in this court after the earlier settlement of the District Court action in 1945 and 1951, was enacted by Congress in 1962, and plaintiffs thereupon filed their original petition in this court. Due to a jurisdictional defect in the bill, resulting from a Supreme Court decision,[2] it was amended in 1964 by Congress,[3] and plaintiffs then filed their second amended petition in this court on November 16, 1964. After further pleadings by both parties, defendant amended its answer on April 27, 1965, to add as a new affirmative defense, an alleged conspiracy by plaintiffs with I. G. Farben to cloak the ownership and control of GDC.

---

[*] The dissenting opinion of SKELTON, Judge, in which NICHOLS, Judge, concurs, follows this opinion.

[1] He then became the titular operator of GDC during the war years, although as will appear below, the actual management was left by him with the existing officers of GDC.

[2] Glidden Co. v. Zdanok, 370 U.S. 530, 82 S.Ct. 1459, 8 L.Ed.2d 671 (1962).

[3] Act of Oct. 22, 1962, Pub.L.No.87–846, 76 Stat. 1115, as amended; Act of Aug. 26, 1964, Pub.L.No.88–490, 78 Stat. 607.

Extensive pretrial conferences, orders and initial trial proceedings were carried on by Trial Commissioner McConnaughey, whose untimely death in 1966 required further time for Trial Commissioner Fletcher to become current with all the matters then unsolved in this complicated case. Further amendments were added to the pleadings. Thereafter, extensive and protracted investigations were conducted of records scattered throughout the Washington area and in Germany, with translation required for the German documents. Equally extensive trial sessions and conferences were required in Washington and in Germany. Proof was closed in August 1968, and briefs and proposed findings by both parties were not finally completed until March 1969. The Trial Commissioner then had to review an extremely long and complex case with extensive briefs by both parties, an immense record of over 2,800 pages of oral testimony and over 900 exhibits, many of which are themselves voluminous.[4]

The Commissioner filed his report in January 1970, including a 21-page opinion and 93 meticulous and necessarily complicated Findings of Fact. Thereafter, extensions of time for filing exceptions and briefs to the court were required, and the case was argued here at the October 1970 term.

Much of the time required to present this mass of material was taken in thoroughly exploring the history of the business and political practices and motivations of I. G. Farben and its German predecessor for the past one hundred years. Defendant insisted that the court review this as an essential part of the "entire mosaic" of Farben's devious international ventures in order to see GDC's part of the pattern. While the Trial Commissioner correctly considered much of this mass of evidence to be of doubtful relevancy, it was admitted over plaintiffs' continuing objections and cov-ered in the findings where relevant. Certainly no onus for the long protracted litigation of this case can be ascribed solely to plaintiffs, despite defendant's contention in this regard.

We have determined that the Findings of Fact made by the Commissioner are amply supported by the record, and that where such findings consist of inferences based upon circumstantial evidence, these inferences may be reasonably drawn from the record. The court is also in agreement with the excellent opinion of Commissioner Fletcher, as herein modified and combined into a single opinion, and hereby adopts the same, together with his findings of fact with minor modifications, as the basis of its judgment for plaintiffs in this case.

It is quite clear, of course, that the Government had the power to seize GDC's stock in 1942 provided only that "adequate provision is made for a return in case of mistake." Central Union Trust Co. v. Garvan, 254 U.S. 554, 566, 41 S.Ct. 214, 215, 65 L.Ed. 403 (1921); Stoehr v. Wallace, 255 U.S. 239, 41 S.Ct. 293, 65 L.Ed. 604 (1921). It is equally clear that, under § 9(a) of the Act,[5] it is the claimant's burden in a case to recover his vested property to show that he was not an enemy, an ally of an enemy, or the agent of either, and that he owned his property beneficially without enemy taint. Societe Internationale Pour Participations, Industrielles Et Commerciales v. Rogers, 357 U.S. 197, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958); von Clemm v. Smith, 255 F.Supp. 353 (1965), aff'd 363 F.2d 19 (2d Cir. 1966); Feller v. McGrath, 106 F.Supp. 147 (W.D.Pa. 1952), aff'd sub nom. Feller v. Brownell, 201 F.2d 670 (3d Cir.) cert. denied, 346 U.S. 831, 74 S.Ct. 24, 98 L.Ed. 355 (1953). The parties are in no disagreement with respect to these fundamental legal propositions. They disagree only as to whether plaintiffs have borne their burden of proof as delineated above.

4. For example, plaintiffs' Exhibit No. 73, the so-called Shafer-Bledsoe Report to the APC, is 162 pages in length with literally hundreds of exhibits.

5. 50 U.S.C.App. § 9(a). This is the section of the Trading With the Enemy Act which makes "adequate provision" for the return of property seized by mistake.

That question, admittedly complex, has been resolved in plaintiffs' favor.

### Beneficial Interest

It is undisputed that all of plaintiffs or their predecessors in interest held legal title to their respective GDC shares when the stock was vested in 1942 by the Alien Property Custodian. However, the Government contends that by means of a prior cloaking arrangement and conspiracy, plaintiffs in reality were holding their stock for the benefit of I. G. Farben, a German corporation, and an enemy national at the time plaintiffs' shares were vested. Our ultimate conclusion is that plaintiffs or their predecessors in interest held beneficial, as well as legal ownership of their stock, and that there was no conspiracy as alleged by defendant at the time of seizure in 1942. Plaintiffs' proof meets both tests of *bona fide* ownership and non-enemy status. Accordingly, they are entitled to recover here.

However different the situation may have been before July 1939, when Ernest K. Halbach, as an American citizen, obtained complete majority control and direction of GDC, no cloak in favor of I. G. Farben existed thereafter with respect to the stock of GDC. No plaintiff or predecessor-shareholder was an "enemy," and each had both legal and beneficial ownership, subject only to options in favor of GDC contained in several stockholders' agreements in 1939, as will be later discussed herein.

### Early History of the German Dyestuff Industry

The early history of the pioneer German dyestuff companies began in 1863, and within 10 years they had become the leading producers of coal-tar dyestuffs in the world. By 1916, these companies had formed a large cartel. Their largest customers were in the United States, and 90 percent of the. dyes sold here were purchased through United States sales corporations organized and controlled by members of this German cartel. Defendant offers this early history for an understanding of the clandestine practice by Farben's predecessor companies, of secretly "cloaking" the actual ownership of their foreign sales companies prior to and after World War I.

In 1925, these German manufacturers combined their companies into one of the most spectacular business cartels recorded in history, I. G. Farbenindustrie, A. G., generally referred to as "Farben." With virtual nationalization of German industry in the 1930's by Hitler's Nazi Party, Farben became an essential and important factor in the Germanic aggression of the 1930's and 1940's.[6] Farben's final end as an operating cartel came with the German surrender on May 7, 1945, but its name remains a specter that has bedeviled the United States Government and its courts for many years, and persists throughout the record of this case.

### The Founding of General Dyestuff Corporation

The history of GDC and its successive shareholders is important, and their connection with Farben must be examined in some detail. The formation of the company in 1925 as a dyestuffs sales organization was part of an overall plan for sales operations within the United States formulated by leading German chemical and dyestuffs manufacturers, the three most prominent of which were known by the abbreviated names of Bayer, Badische and Hoechst. Also, part of the plan was the establishment of United States manufacturing plants to produce

---

6. In the recent publication of the memoirs of Albert Speer, "Inside the Third Reich," Hitler's Minister of Armaments and War Production tells of a crucial conference in 1944 called by Hitler with the highest German political and military leaders and four leading German industrialists to discuss measures to overcome the devastation of German war production plants by the U. S. Air Force bombing. One of these four industrialists named by Speer was E. R. Fischer, Chairman of the Board of I. G. Farben. Speer, Inside The Third Reich (The MacMillan Co. 1970) at 347.

chemicals and dyestuffs with the help of German expertise and patents. Later in 1925, these German manufacturers combined their companies into the I. G. Farben cartel.

The three founders of GDC were H. A. Metz & Co. (the U. S. sales representative for German Hoechst); Kuttroff, Pickhardt & Company, Inc. (the U. S. sales representative for German Badische); and Grasselli Dyestuff Corporation (later to become known as General Aniline Works, which in turn later became a manufacturing division of General Aniline & Film Corporation). The formalities of incorporating GDC under New York corporation laws were handled by H. A. Metz, a trusted U. S. representative (or, in the German language, a *vertrauensmann*) of German Hoechst.[7] However, it was fully understood that GDC's incorporation was undertaken by him on behalf of the three founding companies, each of which had been allotted 2,000 shares of the new company. Metz became the first president and later, the majority stockholder of GDC.

### The History of GDC up to 1939

An original employee, director and minor stockholder of GDC in 1926 was Ernest K. Halbach, a native-born United States citizen. Prior to 1926, he had been a trusted employee of Kuttroff, Pickhardt & Company, which became one of GDC's founders, and the United States sales representative for German Badische.

GDC's originally issued stock in 1925 was free and clear of options, but not for long. About nine months after the original issue, all the shareholders were asked to, and did execute direct option

agreements on their stock to I. G. Farben.[8] For present purposes, the important provisions of these option agreements were that Farben on demand could acquire the shareholders' stock at a price of $100 per share, plus six percent interest; that the shareholder in turn could require Farben to purchase all, or any part of his stock on the same terms, and that the stock certificates could be held in escrow by Farben's designee. Halbach executed such an option on his original 500 shares. Before his death in 1958, Halbach testified in prior proceedings which are part of the record herein, that he was originally opposed to the options to Farben. However, at the time (and for over a year thereafter) GDC was operating at a substantial deficit, and the book value of his shares for which he had paid $100 per share stood at only $72 per share. His business mentor and former employer, Adolph Kuttroff, persuaded him to sign the option by the argument that the new company's future was uncertain, and that the only sure way to protect his $50,000 investment was to execute the two-way option whereby he not only could be forced to sell his stock to Farben but, in turn, he could force Farben to buy it from him at $100 per share plus six percent interest.

In 1926, Halbach's influence and power as a minority stockholder and officer of GDC was minimal at most, and he could scarcely have resisted the beginning of Farben's plan to cloak its control over GDC even if he had so desired. His minimal participation in the 1926 stock options to Farben presents an entirely different situation from that of the later GDC stock options in 1939 when he

---

7. Metz was a prominent New York businessman and former U. S. Congressman from his district. During World War I, his stock in his dyestuff sales company was seized on the ground that it really belonged to his supplier, Hoechst. In subsequent litigation, he was successful in recovering his stock. Also, he had bought certain patents of Hoechst from the APC. At the end of World War I,

in return for his expenses, he "placed them again at the disposal" of Hoechst.

8. Since such options apparently were contemplated from the very beginning, the reason for the nine-month delay is not clear. It may well have been attributable to the desire of Metz and Kuttroff to avoid attracting public attention, and to be able to deny any Farben interest in the event of inquiry.

owned the great majority of the company's stock and controlled its operations.

During this interim period, 1926 to 1939, GDC had become the exclusive importer in the United States of all I. G. Farben dyestuffs. In 1929, Farben caused to be organized in New York the American I. G. Chemical Corporation, later to be known as General Aniline & Film Corporation (GAF). American I. G. was originally formed as a holding company to raise American capital. Control was placed in a Swiss company, I. G. Chemie, which was indirectly controlled by Farben. Among the subsidiary companies of American I. G. was General Aniline Works (GAW), formerly Grasselli Dyestuff Corporation. GAW had the exclusive right to manufacture Farben products in the United States, and GDC was its exclusive sales representative selling GAW's dyestuffs on a consignment basis.

In 1931, H. A. Metz, who by that time had become the majority shareholder in GDC, sold his 4,100 shares to D. A. Schmitz for the sum of $430,000.[9] D. A. Schmitz was a naturalized U. S. citizen and the brother of Hermann Schmitz, the German chief executive officer of I. G. Farben. The 4,100 shares remained subject to Farben's option, were endorsed in blank by D. A. Schmitz, and deposited in escrow with Farben's New York attorneys, Briesen & Schrenk, who handled these transactions. Although he had little qualifications for the job other than his brother's influence, within a few years D. A. Schmitz became president of American I. G. He also became the majority stockholder in other Farben-connected companies in this country, including Farben's technical service corporation, Chemnyco, Inc. D. A. Schmitz was a principal Farben *vertrauensmann* (trusted friend), and through his German brother Hermann, was at all relevant times controlled by Farben.

D. A. Schmitz formed a personal holding company under the name of The Marion Company (Marion) for the purpose of holding options on the stock of GDC and other companies connected with I. G. Farben. The original direct options held by Farben on GDC's stock were cancelled without consideration, and new options thereon running to Marion were executed by the GDC stockholders. The option price remained the same, i. e., $100 per share, plus six percent interest. Marion also obtained similar options on the stock of other Farben-connected companies, including Chemnyco. Marion's shares in turn were optioned to Greutert, a Swiss bank closely connected to Farben. All the stock certificates remained in escrow with Farben's New York lawyers, Briesen & Schrenk.

According to Halbach's testimony before the APC investigators and others, he at first refused to sign the Marion option agreement submitted to him because he saw no sense to it. However, eventually he was persuaded to sign it upon assurance that the old Farben options would be cancelled. He thought it preferable that GDC stock should be optioned to an American company (Marion) rather than to a foreign one (Farben).

The above described setup of companies and stock options remained substantially the same until 1938 when plans were made to dissolve Marion.[10] The options which it held on GDC's stock were cancelled without consideration, and were transferred to Chemnyco, Farben's technical service corporation in the United States. Although the book value of GDC's stock at this time was considerably more than $100 per share, the option price to Chemnyco remained at the fa-

---

9. Schmitz obtained the purchase money by means of a pre-arranged loan from a Swiss bank.

10. As late as December 1938, confidential records of I. G. Farben listed GDC as a 100 percent "I. G. Konsortial" interest, meaning that the company shares were held by Farben trustees. However, these records do not disclose the important 1939 stock ownership changes described later.

miliar $100 per share plus six percent interest. As usual, the shares were endorsed in blank and deposited in escrow with Farben's lawyers, Briesen & Schrenk, in New York City. There can be little doubt at this point in time that Farben continued to have the power to take direct control of GDC whenever Farben's management might desire to do so.

### The Events of 1939

The year 1939 was to see some important changes in the ownership of GDC's stock. The threat of war had become more imminent, and eventually, on September 3, 1939 the Western Powers declared war on Germany. Farben's management began to re-examine its longstanding policy of disguising its control over foreign companies. Some high-ranking Farben officials including in particular, Dr. Kurt Krueger,[11] had concluded that in the event of war between Germany and the United States, there was nothing Farben could do to prevent the seizure of any American company in which it held either a direct or indirect interest. They believed Farben's only hope was to relinquish all its interests, *direct or indirect*, to trusted American friends relying on them to do nothing harmful to Farben's business interests or helpful to its competitors.

This change in Farben policy was an adoption of Dr. Krueger's view that the shareholders of Farben's foreign sales representatives, such as GDC, should be trusted friends, but should also be completely independent and without any legal ties to Farben. In a report to the Reich Ministry of Economics entitled, "Measures to protect the stockholdings of our foreign sales companies", dated July 24, 1939, Farben explained this as a change in policy "which deliberately envisages the abolishment of all legal ties of a direct or indirect nature between us and the stockholders of the sales companies."

This growing change in German viewpoint probably accounts for the fact that earlier in the summer of 1939 Chemnyco cancelled its stock options on GDC's stock without consideration, which meant that Chemnyco gave up its right to purchase for $600,000 GDC stock with a book value then in excess of $2,850,000. Another important change in Farben policy occurred at this time. For the first time since the beginning of GDC stock ownership in 1926, the stock certificates were removed from escrow with Farben's New York law firm, Briesen and Schrenk, and delivered to GDC. Thus, for the first time, GDC and its stockholders gained actual possession and control of their own stock certificates in 1939.

Also, during this period of time, D. A. Schmitz sold his majority shares to GDC itself for $100 per share, resulting in a complete change of control over GDC. This was part of Farben's plan for "the abolishment of all legal ties of a direct or indirect nature between us and the shareholders of the sales companies." D. A. Schmitz as a majority stockholder and Chairman of the Board of Directors of GDC in 1939, was also a director and President of GAF from whom GDC bought the major part of the German dyestuffs it sold in America. D. A. Schmitz, as explained earlier, was also the brother of Hermann Schmitz who was President of I. G. Chemie, Farben's Swiss holding company organized to raise capital for Farben outside of Germany, and an important Farben official. Because of this obvious conflict of interest and his close ties with Farben management, Schmitz was advised by GAF attorneys to dispose of his GDC stock, and did transfer his 4,100 shares to GDC at $100 per share. Thereupon, Halbach purchased from GDC an additional 1,200 shares at $100 per share, which purchase made him the majority stockholder. At the same time, at Halbach's invitation, several key employees

---

11. Although quite elderly, Dr. Krueger was able to testify as a Government witness at the trial of this case. He was an impressive and credible witness.

also bought stock from GDC's treasury, although their purchases were much smaller in amount than Halbach's purchase.

At the conclusion of these 1939 transactions, Halbach held 2,100 shares of GDC stock which constituted the majority of all outstanding shares. For the first time since his employment by the company in 1926, Halbach had the ultimate power to completely control GDC. Also, for the first time since he joined in executing the original options to I. G. Farben in 1926, Halbach (along with the minority shareholders) had actual physical possession of the stock certificates representing the number of shares owned. These transactions gave effect to Farben's express intention of abolishing "all legal ties of a direct or indirect nature" between it and the shareholders of its sales companies.

We should at this point make reference to defendant's contention that no German sales organization, including those owned or controlled by Farben, was ever liquidated or sold in the sense of being completely released from control or domination, once it had been cloaked. It is true that German law required an industrialist who desired to sell or liquidate a foreign holding, to apply to the Government before proceeding with the disposition of that asset. According to Dr. Gustav Schlotterer, a high official in the Reich Ministry of Economics of the German Government, who was presented as defendant's witness, no such application was ever made by Farben in relation to GDC even though violation of that law would presumably involve severe penalties. Defendant concludes that no application was necessary because GDS was cloaked under German law prior to 1939 and alleges that, in fact, the stock transactions of that year brought no change in the company's status vis-a-vis Farben. Plaintiffs advance the polar position that no application was necessary because GDC was never cloaked nor dominated by Farben and, hence, Farben released no right, title or interest in GDC in 1939. We believe the answer lies somewhere in between.

As war clouds continued to gather over Europe in 1939, Germany's demand for foreign currency, which had always been substantial, increased sharply. The massive import programs which supported the war effort and the country's ever expanding indebtedness represented the two primary drains on Germany's foreign exchange reserves. Especially coveted were the so-called "free currencies," such as dollars and pounds, which were regarded as legal tender throughout most of the world. These conditions made it mandatory for Germany to maintain whenever possible, all foreign sales organizations in countries such as the United States, which were primarily responsible for the sale and distribution of German exports. It was these foreign outlets which provided Germany with large accumulations of foreign currency. Thus, it is no wonder that Germany attempted to regulate the sale of foreign interests. However, these regulations became impossible to enforce as general conditions in Germany gradually deteriorated. The reasons are quite understandable.

Germany was completely dominated by a single dynamic force who, as it was later revealed, was truly the world's most deadly madman. His erratic behavior wrought utter confusion and genuine fear within Germany itself. Every determination of any importance was made by Hitler or his handful of sycophantic lackeys. Nevertheless, for some time the Government left unheeded the desperate pleas of German industrialists who prayed for protective measures which would insure against confiscation of foreign assets in the event of war. A cloaking decree issued on September 23, 1938, which offered German industry some measure of the cloaking protection it sought, was quickly cancelled once the Sudeten crisis passed, and the Munich Agreement was concluded. This brief respite deluded the German people into believing that Hitler once again had miraculously avoided the threatened holo-

caust at the last moment. However, when the euphoric mood which gripped the German people after Munich began to dissipate, the innermost fears of these industrialists long ago expressed and ignored, began again to be realized. In most cases, there remained insufficient pre-war time to effect the extensive conditioning and preparation necessary to an effective program of economic warfare.

With the outbreak of war in Europe in September of 1939, the German Ministry of Economics issued top secret directives that cloaking of foreign assets through German companies abroad was a matter of "urgent concern." [12]

This cloaking device aroused formidable political opposition within the German Government. The powerful foreign organization of Hitler's Nazi Party, the "Auslands-Organization," (AO), contended that the futility of cloaking efforts had been proven in World War I, including the risk of the "dummy" refusing to return the property, whereas refusal to cloak left open the opportunity of reclaiming the property when peace was established or at least being compensated for the loss. To the AO, cloaking was only a pretext on the part of private business to deprive the German firms abroad of their German character and to free them from German influence. The AO reproached Farben in this respect with "particular acrimony."

This powerful political opposition against cloaking foreign companies placed the Ministry of Economics in a delicate position within Hitler's government, and it thereafter considered cloaking applications *with a strict view on a case by case basis.*

According to a high-ranking Government official of the German Ministry of Economics:

> With the outbreak of war, serious doubts arose as to whether we had been right in refusing cloaking measures offhand or at least applying as strict a test as we had done. We asked ourselves if we should not to have helped private business in their endeavor to safeguard their foreign property instead of hampering them. We were openly blamed for having allowed German property abroad to be seized by the enemy.

> Thus the gear was reversed by 180 degrees and the circular order of September 9, 1939 was issued. It opened the sluices, and this meant that now, in the intricate war situation and in a brief space of time * * * things had to be done which could have been brought about, if at all, only by calm consideration and long-hand preparation. *Strictly speaking, the order was an act of sheer desperation* * * *. [Emphasis supplied.]

Predictably, these frantic last-minute attempts at cloaking with Government approval proved singularly unsuccessful. The Reich Ministries were no longer willing or able to monitor the actions of German industry. Thus, official control over cloaking and other dispositions of foreign enterprises steadily decreased by both circumstance and design.

By 1939, virtually no Government regulation remained in force. German industrialists were endowed with wide discretionary authorizations to safeguard their foreign interests in any reasonable manner. Dr. Schlotterer, defendant's own witness, so testified: " * * * we left to the firms such measures as they considered proper and right. * * * With increasing danger, of course, we were put in the position where we had to give the firms more and more scope."

Left to their own devices, Farben embarked on an advanced program of liquidation of foreign properties into the hands of "completely independent" but nevertheless "trusted friends." As out-

---

12. " * * * The transformation which these companies will have to undergo will be made for the ultimate purpose of giving them the appearance of *foreign enterprises whose independence can be conclusively shown. * * *"* [Emphasis in the original.]

lined above, this was the policy advocated by high-ranking company officials such as Dr. Kurt Krueger. Thus began the series of complex events, commencing with the cancellation of Chemnyco's options on the GDC stock and the sale of said stock to GDC by D. A. Schmitz, with which we are now primarily concerned.

This new policy approach, developed in the late 1930's, combined with the chaotic conditions that existed in 1939, enabled Farben to allow cancellation of these options and sale of GDC stock without application to or consultation with the Reich Ministry of Economics within the German Government.

Dr. Schlotterer also testified that strict compliance with German law required the filing of an application with his Ministry of Economics in order to effect any substantial change in stock ownership of a foreign sales company, even if the transaction was intended as a cloak rather than a sale, liquidation or other final disposition of property. However, he stated that he knew nothing about the change in ownership of GDC stock which took place in 1939. If those 1939 transactions were intended to be a cloaking of GDC, then Dr. Schlotterer thought that Farben would have filed a written application with his Ministry as it had done in other instances, for example, as in the case of GAF. Yet, to his knowledge, such an application with respect to GDC was never filed by Farben, and this is also a fact established by the record.

The substance of Dr. Schlotterer's testimony was confirmed by Dr. Kurt Krueger. Dr. Krueger recalled that any change or substitution of trustee shareholders of a foreign sales company without the permission of the Reich Ministry of Economics would constitute a direct violation of the German foreign exchange laws. Presumably, this would apply to the substitution of Ernest Halbach for D. A. Schmitz as majority shareholder of GDC if, in fact, this was merely a continuation of Farben's cloaking procedure.

Farben's complete lack of communication with the German Government vis-a-vis GDC further supports our conclusion that Farben's relationship with GDC, before and after 1939, was at all times separate and distinct from the relationships it maintained with its other foreign interests, especially sales organizations. Indeed, plaintiffs cite numerous other instances in which Farben would have been considered in direct violation of the principle and spirit of German law if, in fact, GDC was being operated as a German firm abroad exclusively serving German interests. For example, Dr. Schlotterer testified that from 1936 on, German firms were not allowed to retain any surplus funds abroad without authorization; yet, it was clear that during this time and without any German authorization, GDC had accumulated a substantial capital surplus, and had declared stock dividends in 1940 and 1941 to all of its U. S. stockholders which increased their interest in GDC's surplus by 125 percent.

### Consolidated Dyestuffs Corporation, Limited (Canada)

In addition, although GDC and Consolidated Dyestuffs Corporation, Limited (CDC)—Farben's Canadian sales organization—maintained comparable positions in the hierarchy of Farben's foreign network of sales organizations, there were certain critical differences in the way Farben actually treated them which merit further elaboration.

CDC's stock was first held by nominees whose purchases were initially financed by the Farben constituent companies, Badische and Hoechst. Later the shares were held in the names of trusted persons of Farben, the shares having been endorsed in blank and held for the account of I. G. Farben. The nominal shareholders from inception included Ernest K. Halbach, and in April 1936, D. A. Schmitz took the place of Wilfred Grief as the nominal holder of one share of CDC. The nominal shareholders had executed statements to the effect that

their shares and any dividends thereon were the property of I. G. Farben.

In 1936, discussions were held between the management of the Canadian company and I. G. Farben representatives concerning the recapitalization of the corporation in order to bring about participation of residents of Canada in the corporation and to transfer direct ownership from I. G. Farben. In accordance with these negotiations, various companies were considered as suitable for the ownership of the recapitalized shares of CDC. The Axe Trading Company, Ltd., London (Axe) was selected because the British character of CDC would be better preserved through its being held by an English corporation rather than by an American or Dutch concern. In July of 1936, pursuant to the foreign exchange law and decree of the German Government, Farben requested permission from the German Government to transfer the capital stock of CDC to Axe, subject to the reservation of a reciprocal right of repurchase by Farben.

Under the proposed plan, Axe was to purchase the entire issued stock of CDC and convert 500 shares thereof into six percent redeemable preferred stock. Axe would then sell to CDC's directors five qualifying shares of the capital stock and all the preferred stock, the latter stock being subjected to an option in Axe's favor to repurchase it with a corresponding right of the stockholders to demand that Axe repurchase. As a director, Halbach was to acquire one qualifying share of the capital stock and 50 shares of the preferred stock.

In essence, the above described plan was carried out, the stock purchase by Axe being financed by a loan from Farben. By an agreement dated November 20, 1936, Axe granted Farben the option, irrevocable for 30 years, to repurchase at $100 per share the 1,995 shares of CDC's stock which would remain in Axe's name after it had sold 505 shares to the CDC directors, including Halbach. Those 505 shares were paid for by Halbach and the other directors in cash, who then executed options to repurchase in favor of Axe with a reciprocal right to require Axe to repurchase. By means of the options described above, CDC remained under Farben's potential control until the majority of its shares were seized by the Canadian Government in 1939.

All Farben transactions with CDC stock were reported to and were subject to the approval of the Reich Ministry of Economics (as was required of all companies with cloaked foreign interests). By contrast, the Schmitz 1939 sale of GDC shares to GDC itself, and the cancellation of the Chemnyco options on GDC stock were neither reported to nor licensed by that Ministry.

Further, an official report of two German tax officials concerning Farben's stock subsidiaries referred to the fact that the shares of Farben's Canadian sales company, CDC, were carried as an asset on Farben's balance sheets, and that its dividends had been taxed by the German Government. No such statements were made with respect to GDC despite its surplus and declaration of stock dividends.

We note finally that although the Canadian Government seized the stock of CDC in 1939, Halbach and the other directors were allowed to retain their CDC shares. It is fair to assume that Halbach's shares of CDC also would have been seized if the Canadian Government's investigation had uncovered any questionable relationship between Halbach and Farben. This bolsters our conclusion that Halbach was a loyal American citizen who was free at all times from the domination or controlling influence of I. G. Farben.

In 1939, Farben requested permission from the German Government to drastically alter its existing relationships with its foreign sales companies. In a report dated July 24, 1939 to the Reich Ministry of Economics, Farben stated its new proposal for cloaking:

> For these reasons we have come to the conclusion that real protection of

our foreign sales companies against the danger of sequestration in wartime can only be obtained by our renouncing all legal ties of a direct or indirect nature between the stockholders and ourselves—*which at present give us the right of access to the stocks of our sales companies*—and replacing these legal relations *by transferring the right of access to these assets to such neutral agencies* as by virtue of their personal connections with us of many years standing, in some cases even covering decades, will give us the absolute guarantee that in spite of their complete independence and neutrality they will never dispose of these assets otherwise than in a manner entirely in accordance with our interests. [Emphasis supplied.]

\* \* \* \* \* \*

We should appreciate it, if in consideration of the afore-mentioned summarized reasons, you would now agree to the structure suggested by us, *which deliberately envisages the abolishment of all legal ties of a direct or indirect nature between us and the stockholders of the sales companies.* [Emphasis supplied.]

We give especial emphasis to Farben's statement in 1939 that it would transfer its existing *right of access to the stocks* of its sales companies to trusted neutral agencies. This is precisely what Farben did with GDC in 1939.

From 1926 to 1939, during all of Farben's manipulations of GDC stock through its subsidiaries, the Marion Company and Chemnyco, all of the GDC stock was held in escrow in New York by Farben's U. S. law firm, Briesen & Schrenk, although the GDC stock options held by Farben were transferred to Marion, and by it to Chemnyco. At this point there is little doubt that Farben continued to hold the power to take direct control of GDC at will and that Farben still had "beneficial ownership" of the stock.

However in 1939, in what was probably one of the wartime "acts of desperation" described herein by a high German official, Farben caused Chemnyco to cancel its GDC stock options without consideration. For the first time in the history of GDC since 1926, Farben in its own words transferred its "right of access to the stock certificates", and the stock was removed from escrow with Farben's lawyers in New York, and delivered to GDC. For the first time since 1926, Halbach acquired actual possession and control of his majority stock certificates, free from stock options to Farben or any of its subsidiaries. From 1939 on, Farben received no benefits from GDC because much of GDC's capital surplus was thereafter distributed to Halbach and its other American stockholders in the form of stock and cash dividends until GDC was vested in 1942. There is no evidence or record of any claim anywhere or any time of "beneficial ownership" by Farben during this period 1939 to 1942. Thus, from 1939 to 1942, Farben enjoyed no benefits, tangible or intangible, such as stock options, direct or indirect, from GDC. It had no right of access to the GDC stock and, most importantly, there was no possible method by which Farben could wrest from Ernest K. Halbach the absolute majority stock control over GDC without his consent, and this, we believe, would have been inconceivable.

Finally we can point to a particularly graphic example which illustrates conclusively that GDC did not conform to the definition of a cloaked company as it was understood before 1939 and administered within Farben's empire of foreign subsidiaries or after its proposed reformulation, as quoted above, in 1939. In response to the other radical proposals advanced by Farben on July 24, 1939, the Reich Ministry of Economics insisted upon assurances that in the execution of these new proposals, Farben would continue to have full control over their foreign companies. In reply, Farben declared that it would retain "unre-

552

stricted influence upon the foreign companies" and added:

> We declare, moreover, that the decisive real influence we shall have on the foreign sales companies even after the carrying out of the new measures [presumably the severance of all legal ties], will be sufficient in every respect to answer the requirements of the German governmental and party authorities with regard to personnel and political questions. *We shall always be able to eliminate from our sales business those individuals who are unsuitable or suspect because of their political position* * * *. [Emphasis supplied.]

We emphasize that portion of the statement which was obviously regarded as an indispensable prerequisite to any cloaking operation. At that time, it was necessary not only to satisfy the strict requirements of the German Government which historically viewed cloaking with much skepticism, but also to assuage the inflexible foreign party organization, the AO, which firmly opposed cloaking under any circumstances. Nevertheless, in complete and total disregard of this express declaration and in sheer violation of the most basic principles and philosophical tenets of the Nazi ideology of terror, GDC openly defied that portion of the September 9, 1939 cloaking order which emphatically banned the employment of any Jewish person by a cloaked company: "Of course, the companies are required to see to it that no *Jewish* foreigner be employed by any German firm that is to be cloaked." [Emphasis in original]. Indeed, in 1938, Halbach hired one Gerardo E. Niesser in GDC's sales department in New York after he had been discharged by Farben from its Chilean offices in 1938 because he was a Jew. Mr. Niesser not only continued to be employed by GDC after September 9, 1939, but became GDC's export manager.

We need not recall in detail the genocidal policy practiced against the Jewish people by the Nazis to infer that in 1939 the German Government, Farben and for that matter, any German who valued his life, would consider any Jew to be an individual who was *"unsuitable or suspect because of their political position* * * *."* Recognizing fully Hitler's fanatical devotion to the extermination of "Jewish" as a religious or even abstract concept, we cannot believe that Farben would have permitted the employment of a Jewish individual as export manager, or in any other position, in any company, cloaked or not, in which it maintained command influence. We must remember that Halbach engaged Mr. Niesser *after* he had been released from prior Farben employ because he was a Jew, and subsequently Halbach placed him in a sensitive and prominent position within GDC's sales department.

Whatever equivocations one might advance in regard to Hitler's numerous domestic and war strategies, it has yet to be suggested that the Fuehrer's policy towards the Jewish people was anything less than absolute genocide. Thus, we are forced to conclude that Halbach's operation of GDC in this regard was in complete and open disregard of the directives of both the German Government and Farben as to Jewish people. Certainly, if it still controlled GDC, Farben would have known that its U. S. agent employed a Jewish export manager which it had previously discharged in compliance with Nazi directives. In any event, we cannot believe that this is the type of situation which Farben would have permitted to continue if it retained even a modicum of control over GDC.

The only fair inference to be drawn is that Farben was powerless to remedy this situation because it did not retain any beneficial ownership of GDC nor did it possess any control or influence over its daily operations.

Defendant also relies upon certain entries contained in Farben's so-called books or registers of participations to prove that plaintiffs never truly had beneficial ownership of GDC notwithstanding these stock transactions. These books were secret company records containing terse, and somewhat obscure, en-

tries regarding Farben interests in literally hundreds of companies throughout the world up to the year 1939. The information reflected in these books was gathered from various sources such as file folders in which diverse information pertaining to different industrial interests of Farben was haphazardly accumulated, company records, published changes in company status as required by German law, annual business reports of I. G., and most importantly, orders of the high Farben officials directly responsible for the maintenance of these books. This conglomeration of facts was compiled and typed on loose sheets which were later bound. If a change thereafter occurred, it would be reflected by a handwritten entry. Indeed, both registers submitted for our consideration are replete with handwritten additions and deletions.

The two books in evidence, *the latest bearing the date of December 1938,* contain substantially identical entries showing GDC to be a 100 percent "I. G. Konsortial" interest. The word "Konsortial" meant that the company shares were held by Farben trustees.

In relation to these registers, the court was able to consider the testimony of one Hans Piotrowski, a Farben official who maintained the actual registers until August 1939, and one Dr. Walter Hoyer who was, for sometime, Piotrowski's immediate superior and presumably the source of much of the information entered upon these registers by Piotrowski and his successor.

After an exhaustive analysis of the testimony of these witnesses and the books themselves, we have concluded that they have little probative value, if any. Neither witness could vouch for the accuracy of any information relayed to him by his superiors which eventually was recorded in these registers. Although the facts concerning a foreign enterprise (such as GDC) were provided by the head of that particular Farben department which monitored the foreign company's operation and acted as liaison between it and the parent company, they were never checked for accuracy before they were recorded. This may account for the numerous errors and inconsistencies which could not be reconciled by these witnesses. In fact, Dr. Hoyer freely admitted that when a Farben official required accurate and complete information concerning a particular foreign company associated with Farben, he would rely on the original records which were kept for every company, rather than upon the registers. In addition, the witness stated that corrections, substitutions or deletions were made in each new and up-dated register which was printed periodically. He could not state whether there existed a book of participations which might have been compiled after December 1938.

As to the specific entry listing GDC as a 100 percent "I. G. Konsortial," we may assume that it was correct when originally recorded. However, all evidence available indicates that these registers were not kept up-to-date after 1938 as Germany became further embroiled in the international conflict. This accounts for the lack of modification of the 1938 GDC entry which would have otherwise reflected the highly significant changes which occurred in 1939.

We must remember that GDC was located in the United States. Thus, any information relating to its internal structure in 1939 would have originated there. In fact, as international relations deteriorated, the normal flow of commercial communication was seriously impeded. Nowhere was this more evident than in the United States. As conditions worsened, the reliability factor of the information transmitted correspondingly diminished. At that time, no one was in a better position to assess this situation than Dr. Hoyer. When questioned about possible changes in the capital organization of GDC in 1939, Dr. Hoyer responded:

> The ZA office [which was responsible for the registers] would certainly have recorded any changes in the capital set up if they had come to their attention but when War started, and

it started in 1939, something happened which I think happened in America, too, that an excessive secrecy prevailed and communications were just withheld and especially, I would say, that *information as to changes in participation or capital set up, especially in America, would just not fall under the sort of information that was freely circulated any more.* [Emphasis supplied].

\*   \*   \*   \*   \*   \*

All I said before was that at the time these records were made, the information reflected therein was correct as to the information available to the ZA office. Any later changes, of course, the ZA attempted at all times to reflect such changes but *during wartime it is possible that it did not get all the information to make them.* [Emphasis supplied].

This testimony is particularly significant because we are dealing with a GDC entry in the register made in 1938 which clearly should have been changed in order to keep the books accurate as to the highly significant events in 1939. It is, however, quite understandable that, under the conditions that persisted in 1939, information describing a change in the capital structure of an American sales organization was never reported nor recorded in the registers.

To further illustrate that these registers were totally unreliable and were not kept up-to-date, at least past 1938, we note the occurrence of two significant events in 1939, and the fact that one was recorded in these registers, and one was not. In November 1939, the American I. G. Chemical Corporation merged with its manufacturing subsidiary, General Aniline Works, to form GAF. This change is reflected in the 1938 register. More importantly, however, we have previously stated that in 1939 the Canadian Government seized four-fifths of the outstanding shares of stock of Consolidated Dyestuffs Corporation (CDC), Farben's Canadian sales organization. Yet, the latest book of participations in evidence does not reflect this drastic change in Farben control over CDC but, to the contrary, continues to list CDC as a 100 percent "I. G. (Konsortial)" interest.

In any event, we regard these books of participations as no more than shorthand guides of dubious reliability which were used by Farben officials for quick and handy reference, and which were kept up-to-date, at least after 1938, only as conditions permitted. They were never considered complete nor entirely accurate by the men directly responsible for their maintenance, particularly after 1938. As such, they are virtually worthless to refute plaintiffs' explicit evidence as to Halbach's acquisition of complete majority control of and beneficial interest in GDC in 1939.

In September 1939, Walter Duisberg, former treasurer of GAF, purchased 900 shares of GDC's stock which made him the second largest stockholder. Duisberg was the son of one of the founders of I. G. Farben, and was a highly trusted *vertrauensmann*. Later, Duisberg sold a portion of his shares back to GDC and still later in 1941, had contracted with the company to sell it the balance, but the Treasury Department blocked the latter transaction.

Defendant asserts that Duisberg as a stockholder was also a Farben agent who could be relied upon to take over control of GDC for Farben if Halbach died or retired. However, the record is clear that Halbach was opposed to this; Duisberg was asked to resign as a director, and did so. After December 1941, he could have been outvoted by the other minority stockholders in the event of Halbach's death or resignation, and they were also opposed to any control of GDC by Duisberg. If the 1939 stock sale to Duisberg was relied upon by Farben to retain control of GDC, it failed because of Halbach's outspoken opposition to Duisberg's potential control over GDC as a stockholder or director.

At the time of these stock purchases from GDC, all the shareholders entered into a stockholders' agreement which

granted to GDC the option to purchase at $100 per share plus six percent interest from the date of the last dividend, all of the shares of any stockholder who desired to sell, who died, or who ceased to be a director, officer or employee of GDC.[13]

Between 1939 and 1941, several modifications were made to the stockholders' agreement, but the option price of $100 per share plus six percent interest from the date of the last dividend was never changed. During this period, a few new shareholders were added, including Halbach's friend and physician, Dr. St. George, and the president of a GDC supplier, George A. LaVallee.[14]

Defendant has referred to these new stockholders as being "completely subservient to the wishes of E. K. Halbach" and "entirely responsive to the will of E. K. Halbach." Insofar as the affairs of GDC were concerned, these statements (and many like them) describing Halbach's dominating position are no doubt true. What counsel for defendant have refused to do, however, is to carry their argument to its own logical conclusion. When in August 1939, Halbach acquired the majority shares in GDC, subject only to an option running to GDC itself, Halbach's dominance (long sought by him) was indeed complete. That dominance, however, extended not only over the minority shareholders, directors and officers of GDC. It likewise extended, so far as GDC was concerned, over all individuals and corporations having had anything to do with GDC in the past. If Halbach and the other shareholders were merely Farben nominees with Farben holding beneficial ownership of the GDC stock, one would assume that there was some way by which Farben could have taken control of the company. How-

ever, there is nothing in this record to indicate that Farben could have done so, *after August 1939*, without Halbach's acquiescence. Assume that the APC had not seized GDC's stock, that Farben had survived World War II and that the Halbach family trust had not been created; to state that Halbach would have voluntarily turned over to Farben the highly successful company which he had built, and ultimately controlled after 1939, would be an incredible conclusion. Farben's only "trump card" would have been to refuse supplies of dyestuffs to GDC after 1939, a weak reed indeed, when one considers the respect accorded by the American dyestuffs industry to Halbach's admitted ability to sell dyestuffs, be they Farben products or those of any other manufacturer. It is clear that Farben considered Halbach to be one of its trusted American friends, or *vertrauensmann*, and up to 1939, he may have been in a strictly business sense. GDC bought most of the dyestuff products it sold in the United States from Farben companies. Nonetheless, it runs counter to human nature, as well as all the inferences permissible from this record, to conclude from this fact that Halbach would in 1939, or thereafter, have voluntarily relinquished to Farben his stock control of GDC for a mere $100 per share plus six percent interest.

*The GDC Stockholders' Agreements*

Defendant also points to the GDC stockholders' agreements as supporting its contention that plaintiffs never had any beneficial interest in their GDC stock beyond the $100 per share plus six percent interest option price. The argument is that the "intrinsic value of the stock vested" never exceeded that amount, a proposition which defendant claims is supported by the testimony of its two

13. Two of the shareholders, Dr. Duisberg and Dr. A. V. St. George, who were neither directors, officers nor employees, were by separate agreements relieved from this latter provision.

14. At Halbach's invitation in January 1940, Dr. St. George purchased 500 shares of GDC as an investment for $100 per share. In December 1941, again at Halbach's invitation, LaVallee purchased 50 shares largely to promote relations between his company and GDC. Along with Duisberg, these two men were the only non-employee shareholders of GDC, although LaVallee did become a director of the company.

acknowledged experts on stockholder agreements in close corporations, Professor Israels and Dean O'Neal. This is not true. Two stock dividends had substantially increased plaintiffs' interest in the GDC surplus. When this was brought to Dean O'Neal's attention on cross-examination, he readily agreed that the value of the stock was thereafter "more than double" what it had been before.

Defendant's counsel place considerable emphasis on the testimony of Professor Israels that he had never seen a stockholders' agreement where the fixed price contained in the agreement was substantially lower than the book value of the stock, and on Dean O'Neal's conclusion that the GDC stockholders' agreement was "a hybrid sort of arrangement" because, among other reasons, an employee-stockholder "can be taken out by the exercise of the option, and that option can be made exercisable by discharging the employee."

That there is nothing illegal or sinister about such provisions in a stockholders' agreement, however, is clear from the decision in Martin v. Graybar Electric Company, 285 F.2d 619 (7th Cir. 1961). That case involved a stockholders' agreement containing provisions very similar to the GDC agreements. The stock of Graybar Electric Company was entirely owned by its employees and pensioners, and it was subject to an option in favor of Graybar whereby, in the event of a stockholder-employee's "death * * * or cessation of employment other than retirement on a pension," the company was entitled to purchase all his stock for the original $20 per share purchase price plus accumulated dividends. Martin, a long-time Graybar employee, owned some of its stock, part of which he had acquired by purchase and part by stock dividends. All his shares were subject to the above-described option. For the stock which he purchased, he had paid $20 per share, and as the court put it at 285 F.2d at 622:

* * * All of the stock was worth more than $20.00 a share at the time it was acquired by plaintiff; some of it had a value greatly in excess of that amount. Plaintiff as well as other employees could purchase at this low price because of the option which was expressly related thereto. * * *

Following his voluntary resignation from the company, Martin endeavored to repudiate the option agreement on the ground that "the stock was worth more than the option price and he wanted more money." 285 F.2d at 623. He was unsuccessful in this effort. The Seventh Circuit affirmed the action of the District Court dismissing Martin's action and decreeing specific performance of the option agreement in Graybar's favor. The court held that, under the law of New York (the applicable law in the case), the option agreement did not constitute an unreasonable restriction on the transferability of Graybar's stock and was not part of an illegal plan to control the employees' free choice of action. Due to the strong similarity between the GDC and Graybar option agreements, this case is persuasive authority in favor of plaintiffs' position that the GDC's stockholders' agreements were fair and reasonable to all concerned. Indeed, defendant's expert, Dean O'Neal, agreed that a shareholders' agreement between GDC stockholders was "certainly justified" and, while the Dean himself would have made some specific provision for succession to control, he thought that the agreement so far as it went, was a "reasonable" one.

Also during this period, 1939 to 1941, two stock dividends were declared which had the effect of substantially increasing the stockholders' respective interests in GDC's large surplus. Specifically, for each share purchased in 1939, a stockholder by 1941 had two and one-quarter shares. This meant that anyone, including Farben, who desired to purchase GDC stock after 1941 would be required to pay 125 percent more than he would have paid in 1939 to acquire the same percentage of the total amount of GDC stock. It is fair to assume, therefore, that had the stockholders' agreements

been part of a scheme or conspiracy to cloak the true beneficial ownership of GDC stock and thereby allow German interests, such as Farben, to repurchase the stock after the war, then they would have contained a standard antidilution clause providing for a *pro rata* reduction in the per share price in the event of a stock dividend or other similar reclassification.

We conclude that the 1939 stockholders' option agreements were legal, fair and reasonable, and that plaintiffs all acquired the full beneficial interests in their GDC stock.

### The Events of 1940–1942

Halbach's testimony in a prior proceeding, which is part of the present record, was that in 1940 he was asked by two Farben officials to travel to Genoa, Italy in order to devise a plan which would break the British blockade of Germany by shipping dyestuffs to GDC via Siberia. Halbach stated that his main concern was to keep his GDC American consumers who had been using these Farben dyestuffs in their goods, "going on them" by a continuous supply through these shipments. However, Halbach refused to accept any responsibility for the shipments via Siberia. Instead, he insisted that he buy the goods from Farben in Japan with freight, insurance and all other costs of shipment to be paid by Farben. Upon delivery to GDC in Japan, the goods would be shipped to America on American ships by GDC. Farben's two officials eventually agreed to Halbach's terms. To close the deal, however, Halbach exacted an added five percent discount on Farben's prices, from which GDC realized a profit of $250,000 on these shipments at Farben's expense.

Although a secret code for communications was adopted in order to avoid detection by the British who were holding U. S. mail to the Continent at Gibraltar for censorship, the details of these transactions between Halbach and Farben were never concealed. On his return to the United States, Halbach went immediately to the National City Bank of New York, and explained the plan to its President and Vice President in order to establish a letter of credit in Switzerland for payment to Farben for the shipments. The Bank's officers doubted its feasibility, but told him to seek approval and clearance from the United States Treasury Department in Washington. Upon full disclosure of the plan, the Treasury Department advised him that it saw no reason why he should not pay for the goods and bring them over in the manner proposed. The Bank then insisted on a clearance from the State Department, which approved. Finally, the Bank required Halbach to disclose the plan to the Defense Commission, which also approved the plan through its chief, a Dr. Weidlein. Halbach testified that Dr. Weidlein said, " * * * I don't see any reason why you should not do it, we want German dyestuffs in here, we don't want our people to run short of those things. * * * They are things that we need in this country, and they should come in, and * * * I am entirely in favor of it." As a result, Halbach secured his letter of credit from the Bank, and several shipments were made, with delivery to GDC in Japan.

Throughout his 1952 testimony, Halbach was explicit in naming the officials of the Bank and the U. S. with whom he talked about this plan. Certainly there was no secrecy or concealment by Halbach about either the conference in Italy with Farben's representatives, or about the plan to which they agreed. There was nothing sinister or illegal about this agreement in 1940, a year before we entered the war, and there was nothing illegal about the plan to evade the British blockade. It must be remembered that this testimony was given by Halbach during his 1952 trial under an indictment by the United States for criminal conspiracy with Farben and others, in restraint of trade in which Halbach was found not guilty by a jury. His testimony in 1952 was ruled admissible as evidence in this case by the Trial Commissioner, and neither party has except-

ed here to this ruling. We accept this testimony as credible evidence to establish that this trip by Halbach was not made to either aid the German war effort or to aid Farben. His trip to Italy in 1940 was instead a shrewd maneuver by an enterprising and independent American business man to obtain for his American customers a continuous supply of Farben dyestuffs essential to their business. He testified that many of his American customers had relied and insisted upon the quality and uniformity of Farben's dyestuffs in their manufactured products. In the bargaining process with Farben, Halbach dictated the exact terms of delivery by which GDC would deal with Farben as its supplier, and also exacted an additional five percent discount on the price which yielded a profit to GDC of $250,000 at Farben's expense. By this time in 1940, Halbach was operating GDC so successfully that its stockholders had received stock dividends of one and one-quarter times their original stock purchase. If Farben's leaders still had any illusions after this 1940 transaction that this shrewd and independent American businessman was running GDC for their benefit as a secret agent, they must have been gullible indeed. We cannot interpret this trip to Genoa in 1940 by Halbach as evidence of Farben's beneficial ownership of GDC's stock. On the contrary, it establishes still further that in 1940, Halbach and the other stockholders still held their 1939 stock purchases solely for their own benefit.

We have already discussed earlier events concerning Farben's control over its Canadian sales company (CDC) as contrasted with its U. S. sales company (GDC). Two 1940 transactions involving CDC bear mention at this point.

In March 1940, the French dyestuffs firm of "Kuhlmann" cancelled its agency contract with CDC on the ground that CDC was controlled by an enemy enterprise, I. G. Farben. In its letter of cancellation, Kuhlmann refers sarcastically to CDC's contention that the Canadian Custodian of Enemy Property had never proved that CDC was enemy-controlled. The letter goes on to state that, as CDC well knew, there was never any communication of any sort between CDC and Kuhlmann but only between I. G. Farben and Kuhlmann regarding Kuhlmann's Canadian business, and concludes "that the I. G. could use, towards you, practically unlimited power." So far as this record discloses, Farben never operated in such fashion towards GDC even during the early period when Farben had direct options on GDC's stock.

It also appears from a Farben letter in evidence, dated 1940, that negotiations were about to be conducted for the sale by Farben's Axe Trading Company of its CDC stock to the National City Bank of New York. This letter, of course, is nearly incomprehensible inasmuch as Axe's CDC shares had already been seized by Canada in 1939, and it may be inferred that this is why the proposed sale was never consummated. However, the letter does tend to prove the fallacy of defendant's repeated assertion that, under no circumstances, would Farben ever consider selling one of its foreign sales companies.

In early December 1940, after obtaining the consent of the other shareholders, and for income and estate tax reasons, Halbach turned over his 3,150 shares of GDC (which by reason of a stock dividend in 1941 later increased to 4,725 shares) to his wife, the late Elizabeth S. Halbach, and his attorney, the late Colby Stilson (a member of the Breed, Abbott and Morgan law firm) as trustees of an irrevocable trust for the benefit of his wife for life and then to his daughters, the surviving plaintiffs, Mary Elizabeth Kemmerer and Ann H. Bumsted. The trusteed shares, of course, remained subject to the stockholders' agreements. A gift tax was paid on this transfer in trust. Technically speaking, therefore, at the time of vesting in 1942, Halbach was no longer the "owner" of any stock in GDC. Like Shafer and Bledsoe in their report to the APC, however, the family trust has been treated as

of no particular importance to the resolutions of the issues involved herein. There can be no question on this record that, even after the creation of the family trust, Halbach continued to exercise *de facto* control of GDC as its chief executive officer. The trust arrangement would have become important only in case of Halbach's death which occurred many years after vesting.

### Minority Stockholders of GDC

A brief analysis is now in order with respect to the minority GDC stockholders in 1942 when the stock was seized:

(a) *J. Robert Bonnar.* Bonnar is a native born American citizen, and a graduate of MIT as a Chemical Engineer. He progressed through GDC to become its technical sales director and is presently corporate director of purchasing for GAF. Pursuant to Halbach's invitation, he purchased 47½ shares of GDC and, after stock dividends, held 60 shares at the date of vesting, an action by the Government which he vigorously protested. As an expert in dyestuffs, he was active in Government committees during World War II to advance the United States war effort. Other than the stockholders' agreements described above, Bonnar entered into no agreements, written or oral, express or implied, which placed any limitation on his ownership of 60 GDC shares, the certificates for which were at all times prior to vesting, in his personal possession. When the United States assumed control of GDC, Bonnar was not discharged.

(b) *Rudolph Lenz.* Lenz was also a native born U. S. citizen. He graduated from Dartmouth College in 1914, and thereafter went to work for Grasselli Dyestuff Corporation, one of the founders of GDC. Lenz became Halbach's first assistant. At the latter's invitation, he bought 250 shares of GDC which holdings by stock dividends had increased to 400 shares at the time of vesting. He, along with Halbach and Martin, constituted GDC's Board of Directors. Lenz was the beneficial owner of his 400 shares of GDC registered in his name on the date of vesting, and held by him in his personal possession, subject only to the provisions of the aforesaid stockholders' agreements. The United States did not discharge him when it vested GDC.

(c) *Lennart Swenson.* Swenson is a native born U. S. citizen. He was originally employed by Kuttroff, Pickhardt & Co., a founder of GDC. He was one of Halbach's trusted assistants and was GDC's sales manager. At Halbach's invitation, he purchased 60½ shares of GDC and, together with stock dividends, he held 73 shares at date of vesting. He had beneficial ownership of those shares at the date of vesting, and had personal possession of the stock certificates, subject only to the provisions of the aforesaid stockholders' agreement. The United States did not discharge him when it seized GDC in 1942.

(d) *Percy Kuttroff.* Kuttroff was a native born citizen of the United States. He was the son of Adolph Kuttroff, a principal owner of one of GDC's founders, Kuttroff, Pickhardt & Co. This firm represented the interest of Badische Anilin und Soda-Fabrik in the United States. Badische was one of the most important members of the I. G. Farben cartel.

Despite his ancestral connections, Percy never really "made it" with GDC. He was the manager of the GDC statistical department which was not a policy-making position. In 1932 he had acquired 400 shares of GDC from his father, but those shares were eventually subjected to the Chemnyco option. In February 1939, Chemnyco exercised the option and paid Percy $40,000 plus interest, for the 400 shares.

Five months later, Halbach offered Percy GDC treasury stock, and he purchased 100 shares for $10,000. At the time of vesting, with the added stock dividends, Percy owned 225 shares, the certificates for which were in his personal possession at the time of vesting. Percy entered into no agreements,

express or implied (other than the above described stockholders' agreements), which in any way limited his legal and beneficial ownership of his 225 GDC shares. The United States did not fire him when it vested GDC.

(e) *H. Walford Martin.* Martin was born in England and became a naturalized citizen of the United States in 1919. He was secretary of GDC and, along with Halbach and Lenz, comprised GDC's Board of Directors. Pursuant to Halbach's invitation, he purchased 200 shares of GDC and, with stock dividends owned 350 shares at the time of vesting. He had physical possession of his stock certificates at all times, and never entered into any agreements, express or implied (other than the above described stockholders' agreements), which in any way limited or restricted his beneficial ownership of his GDC stock. When the United States Government seized GDC, Martin was not fired.

(f) *Henry F. Herrmann.* Herrmann was born in Germany in 1890, and was naturalized as a United States citizen in 1904. He joined GDC in 1928 and retired in 1958 after a promotion by the APC Administration of the company. On Halbach's invitation, he purchased 20 shares of GDC, and with the stock dividend in 1941, ended with 30 GDC shares. He had physical possession of his stock certificates and entered into no agreements, express or implied, restricting his ownership other than the stockholders' agreements. When his GDC shares were seized, he was not fired by the United States.

(g) *Anthony T. Wingender.* Wingender was a native born United States citizen. He was treasurer of GDC. At Halbach's invitation, he purchased 35 shares of GDC stock and received five shares by way of a stock dividend. He had physical possession of his certificates representing 40 shares of GDC stock, and he entered into no agreements, express or implied, restricting his ownership of his shares other than the described stockholders'

agreements. When his GDC shares were seized, he was not discharged, but continued as treasurer of GDC.

(h) *George A. LaVallee.* LaVallee was a native born United States citizen, and was president of Marietta Dyestuff Corporation in Ohio. Marietta was a relatively small producer of dyestuffs, and GDC was its exclusive sales agent. Several months after Duisberg had sold some of his shares back to GDC in the summer of 1941, LaVallee, at Halbach's invitation, purchased shares of GDC stock, and became a director of GDC. His motivation was to further intercompany relationships since GDC was Marietta's most important customer.

LaVallee held the stock certificates representing his 50 shares of GDC in his personal possession, and there were no restrictions on his beneficial ownership thereof other than the stockholders' agreements. After seizure, LaVallee was continued as a GDC director under the administration of the APC.

(i) *Dr. Armin V. St. George.* Dr. St. George was born in New Jersey in 1892 and was a practicing physician, and internist, and pathologist with outstanding professional credits. He volunteered and served as an officer in World War I, receiving two citations. Pursuant to Halbach's invitation, he purchased 500 shares of GDC stock at $100 per share. In 1941, he received and retained cash dividends and a 50 percent stock dividend from GDC which increased his holding to the vested total of 750 shares. At all times he had personal possession of his GDC stock certificates.

Dr. St. George held his stock subject only to the GDC option agreements which agreements, however, were modified as to him to provide that the option in favor of GDC would be effective only if he desired to sell, or died, since he was neither employee, officer, nor director of GDC. He was entirely inactive in GDC affairs.

*The Vesting of GDC and GAF, Merger of
GDC Into GAF, and Subsequent
Sale of GAF*

On or about June 30, 1942, Leo T. Crowley, as Alien Property Custodian, vested in himself on behalf of the United States, all of the outstanding shares of stock of GDC. Earlier, about April 24, 1942, he had vested title to the GAF stock. In June 1942, the Secretary of the Treasury issued a publication entitled, "Administration of the Wartime Financial and Property Controls of the United States Government." This official publication dealt with the U. S. "vesting technique," using the vesting of GAF as an example. After explaining the intensive U. S. investigation of GAF and the removal of its key executive personnel, the report added:

> * * * Following the vesting, the United States Government removed the rest of the undesirable executive personnel and replaced them with executives of proven loyalty chosen from the American chemical industry. Nevertheless, the investigation continued until recently *and all employees with any past connection with I. G. Farbenindustrie were dismissed* [Emphasis supplied.]

In striking contrast, not a single key employee of GDC was dismissed by the United States following the vesting of the GDC stock, and Halbach was retained by the APC to run the company throughout the war and several years thereafter, although it was entirely clear that GDC had been Farben's exclusive U. S. outlet for its dyestuff sales for many years.

In 1957, Mr. Crowley, the former APC, testified before a subcommittee of the Senate Judiciary Committee as follows:

> On the assumption that at the end of the war all properties would be returned in accordance with our traditional policy, the stock of General Dyestuff was taken into a kind of agreed protective custody because otherwise it would have been very difficult to have managed the assets of General Aniline & Film with which General Dyestuff had an exclusive sales contract. Halbach himself, an American citizen, was by agreement permitted in effect to remain in command of the vested assets and to hold high place in the War Production Board throughout the war. In other words, *the stock was seized for reasons of economic necessity in the full expectation that it would be returned at the end of the war.* [Emphasis supplied.]

When Mr. Crowley, as Alien Property Custodian, vested GDC, he directed a most thorough and searching investigation of the company and its chief executive officer, Ernest K. Halbach, by the Honorable John J. Burns who had been appointed as the Government's lawyer for GDC. Mr. Crowley also appointed two special investigators, E. M. Shafer and E. P. Bledsoe. Their extensive report to the APC in 1943 covered 162 pages, with hundreds of exhibits, including a 176-page report from the Treasury Department's investigation of GDC and Halbach. The Shafer-Bledsoe Report was prepared after a six months' investigation of the relationship between GDC, Halbach and Farben. It is factual, comprehensive and well documented, and as supplemented by both of its authors' testimony in this court, is reliable and worthy of credence. It supports the conclusion arrived at herein that plaintiffs are entitled to recover in this action.

Defendant relied extensively upon the Weston Report prepared by the Treasury Department in 1942 as adverse to the position of Halbach and GDC. The Weston Report reached this conclusion as to GDC:

> General Dyestuff, since the date of the incorporation, has been controlled by I. G. Farben. The present situation, if undisturbed, will serve to retain this property for the I. G. until the conclusion of hostilities *and in the meantime continue to syphon funds* from the seized General Aniline & Film Corporation to the extent of several million dollars per annum which will

then be held by General Dyestuff for the benefit of I. G. Farben-industries. [Emphasis supplied.]

The record in this case is absolutely devoid of evidence that from 1939, when Halbach gained control of GDC, until 1942, when GDC was vested by the APC, GDC ever "syphoned off" or held one dollar for the benefit of I. G. Farben. Whatever profit Halbach and GDC made by buying dyestuffs from GAF, and then selling them to American customers went to GDC's American stockholders in the form of stock and cash dividends, not to Farben.

Despite the reliance placed by defendant on the Weston Report, it never produced any of the Treasury Department staff who prepared the report, whereas the Shafer-Bledsoe Report was fully supplemented by the testimony in this case of its authors. The 1942 Weston Treasury Department Report, as a possible basis for the later vesting of the GDC stock in the same year, was commented upon by the APC appointed counsel for GDC, John J. Burns, in his report to Mr. Crowley of December 14, 1943:

> "I, therefore, am of the opinion that the vesting of this stock * * *, while perhaps justified at the time upon practical grounds and upon the basis of the information *(or misinformation) given you by the Treasury Department* was not valid legally." [Emphasis supplied.]

### Burden of Proof

Defendant concedes that the Trial Commissioner has correctly stated the burden of proof on plaintiffs to prove under § 9(a) of the Trading With the Enemy Act:

> * * * that he was not an enemy, the ally of an enemy, or the agent of either, and that he owned his property beneficially without enemy taint. * *

The parties are in no disagreement with respect to these fundamental legal propositions. Essentially, they disagree only as to whether plaintiffs have borne their burden of proof as delineated above. That question, admittedly complex, has been resolved in plaintiffs' favor.

Defendant now asserts, however, that the Commissioner incorrectly concluded that plaintiffs sustained their burden of proof because he has, in fact, erroneously placed the burden of proof on defendant rather than on plaintiffs. Defendant has advanced several instances of alleged misapplication by the Commissioner because of his alleged speculations and assumptions favoring plaintiffs, and his rejection of plaintiffs' burden of proof as to certain documentary evidence. Under such circumstances, defendant asserts that the court must, as a matter of law, find in favor of the United States.

As an example of the Commissioner's alleged misapplication of burden of proof, defendant objects to the Commissioner's comment that defendant had never explained why, after the stock vesting in 1942, the Government dismissed all the General Aniline & Film executives, but retained Halbach and all the other GDC executives despite their past connection with Farben. To say that this placed an improper burden of proof on defendant is to ignore a corollary and shifting duty upon defendant of going forward with further rebuttal evidence, as well enunciated in 29 Am.Jur. 2d Evidence § 124 (1967):

> * * * The burden of proof, in the sense of the burden which rests upon a party to establish the truth of a given proposition * * * never shifts during the course of the trial, but remains from the first to the last upon the party on whom the law cast it at the beginning of the trial * * *. The duty of going forward with the evidence, however—that is, the burden of proof in the sense of the duty of producing evidence to meet the evidence produced or the prima facie case made by one's adversary—shifts or passes from side to side as the trial of the case progresses and evidence is introduced by the respective parties.

No effort has been made by the Government to explain this singular differ-

ence in the treatment of the key employees of these closely connected companies, GDC and GAF. The only logical inference is that the responsible Government officials distrusted GAF's executive personnel as probable agents of the German Government but had confidence in the loyalty, competence and trustworthiness of GDC's executive personnel despite the fact that their GDC stock had been seized. Defendant's own Alien Property Custodian, Leo Crowley, had seized the GDC stock, and he must have known more about the circumstances and reasons for that seizure than any other Government official.

We think that the Commissioner's conclusion from the evidence as to the confidence of our Government in 1942 in the loyalty, competence and trustworthiness of GDC executives and personnel after seizure of their stock, as contrasted to those of GAF, is the result of correctly placing the primary burden of proof on plaintiffs, and the corollary burden of going forward with rebuttal evidence on defendant, as already discussed herein.

We must also weigh the exceptions taken by defendant to the Commissioner's findings in light of the court's Rule 147(b):

> * * * Due regard shall be given to the circumstances that the commissioner had the opportunity to evaluate the credibility of the witnesses; and the findings of fact made by the commissioner shall be presumed to be correct.

Our court has defined the scope of defendant's burden to overcome this presumption:

> In this, as in all cases in which a Commissioner has carefully weighed conflicting evidence, the burden of sustaining exceptions to the findings is far from slight. We start with the double directive that due regard must be given to the Commissioner's opportunity to judge the credibility of the witnesses and that his factual findings "will be presumed to be correct." Rule 48 [now Rule 147(b)]. That pre-

sumption is dissipated only by a strong affirmative showing. Where, as often happens, what appears to be a sound objection to a finding is answered by an equally sound explanation in support of it, the presumption will carry the day. Where the specific testimony of witnesses, believed by the trier-of-fact, is countered only by the advocate's theoretical arguments which may or may not be correct, we must ordinarily accept the trier's evaluation. The same is true where the Commissioner has preferred one witness to an event (or set of witnesses) over another. Stronger assaults must be launched before the recommended findings can be overthrown. This is not to abdicate the court's function as the ultimate finder of the facts. In a fallible and busy world, all that can be required for the due administration of justice and the foundation of a judgment is that, *when the balance is close,* we rely on the appraisal of an unprejudiced trier who has followed a process which will generally bring about a correct determination. Davis v. United States, 164 Ct.Cl. 612, 616–617 (1964). [Emphasis supplied.]

The court has expressly emphasized and relied upon the importance of this rule in Connolly-Pacific Co. v. United States, 358 F.2d 995, 997, 175 Ct.Cl. 134, 138 (1966); J. D. Hedin Constr. Co. v. United States, 347 F.2d 235, 240, 171 Ct. Cl. 70, 75 (1965); Dodge Street Bldg. Corp. v. United States, 341 F.2d 641, 644, 169 Ct.Cl. 496, 501 (1965); Garstin v. United States, 352 F.2d 537, 539, 173 Ct. Cl. 550, 553 (1965); Litchfield Mfg. Corp. v. United States, 338 F.2d 94, 98, 167 Ct.Cl. 604, 612 (1964); Commerce Int'l Co. v. United States, 338 F.2d 81, 86, 167 Ct.Cl. 529, 537 (1964).

Significant in the exception to the Commissioner's findings and the argument on the burden of proof by defendant is the fact that it has completely ignored the effect of our rule quoted above that the Commissioner's findings

of fact "shall be presumed to be correct." We refer to the, fact that the Commissioner, in his meticulous analysis of the evidence supporting his findings, stated with complete candor in his opinion:

* * * I have done so to the best of my ability and without any really deep-seated convictions that I am right. I say this because the complex events involved occurred so long ago that those persons who really knew the whole truth are dead. The witnesses whom I had an opportunity to hear and observe knew only fragments of the complete story, and the massive documentary evidence in the record is both incomplete and conflicting. * *

Defendant refers to this statement by the Commissioner in arguing that "under such circumstances * * * the court must as a matter of law find in favor of the United States." However, defendant has significantly ignored throughout its brief its own burden to make a strong, affirmative showing that the Commissioner's positive and unequivocal evidentiary findings are wrong. Failing this, as the court said in *Commerce Int'l* and *Davis, supra,* "the presumption will carry the day."

Defendant places much reliance upon Feller v. McGrath, 106 F.Supp. 147 (W. D.Pa.1952); aff'd sub. nom. Feller v. Brownell, 201 F.2d 670 (3d Cir.), cert. denied, 346 U.S. 831, 74 S.Ct. 24, 98 L.Ed. 355 (1953), which also involved a seizure of German property by the APC during World War II. Although an American citizen (Feller) owned clear legal title to the shares of the vested company which was, in reality, the American branch of a German corporation (SAG), defendant demonstrated to the satisfaction of the District Court that plaintiff had entered into a secret agreement to conceal the true beneficial ownership of the disputed stock. There was no "direct evidence" that such an agreement to conceal did exist. Nevertheless, after a thorough evaluation of all the evidence presented, the Court concluded that:

* * * the existence of such an agreement is to be inferred from the testimony of plaintiff, from his negotiations with the officials of SAG, from the contracts between the parties, the actions and reactions of the plaintiff and the Germans * * * and from the circumstances. 106 F. Supp. at 151.

At the outset, it may be observed that Feller was a German national, employed by SAG (the German parent corporation) in Germany before he came to the United States to continue as manager of the company's American branch, and he later became a naturalized citizen. The evidence is clear in the present case that Farben pursued a similar policy in relation to its cloaked companies. For example, the officers of GAF were German citizens working for the Farben cartel emigrating to the United States to become naturalized citizens and Farben *vertrauensmann.* This was not true, however, of GDC. Halbach was a loyal native born American who never worked directly for Farben or any other foreign company. His employment after 1926 was with a United States corporation, GDC (not an American branch of a German corporation), as a distributor of Farben dyestuff products. After 1939, all transactions between' GDC and Farben were made at arms-length, and all profits derived from resale in the American market were accumulated and used for the exclusive benefit of GDC and its shareholders.

Thus, although in *Feller* there was at least some evidence from which the District Court could reasonably infer the existence of a secret agreement to cloak the beneficial ownership of the vested company, by contrast, we have been unable to isolate even a scintilla of evidence in the instant case from which a similar inference can be drawn. In fact, the evidence that was adduced at trial supports the completely opposite conclusion, *i. e.,* that Halbach, at all times after he acquired majority control of GDC stock in 1939, ran that company for the benefit of himself and the other shareholders

of GDC and not for the benefit of I. G. Farben or any other foreign interest.

On appeal, the District Court's judgment in *Feller* was affirmed by the Third Circuit. In its one paragraph *per curiam* opinion, the court revealed the basis for its judgment:

> * * * The questions of fact involve the examination of a very considerable amount of evidence. The district judge considered each of these questions and came to the conclusion that alien ownership was established satisfactorily. He wrote a careful opinion in which his reasons for the conclusions were explained. * * * We agree with him and for the reasons he stated. 201 F.2d at 671.

The Third Circuit correctly gave much weight to the conclusions of the finder of fact (the District Judge) who was in the best position to consider the massive record, evaluate the testimony and demeanor of the witnesses, and draw the necessary inferences therefrom. As previously explained, our Rule 147(b) endows the findings of fact made by our Trial Commissioner with much the same presumptive correctness as that accorded the decision of a District Judge. The essential difference between this case and *Feller* is that on the basis of different facts and circumstances, the finder of fact formulated an opposite conclusion. However, our affirmance on the basis of his findings and the reasons stated is completely harmonious with the decision and the expressed rationale of the Third Circuit in *Feller*.

Disparaging reference has been made to "concealment" by Halbach in his personal income tax returns. Despite the most searching and continued tax examinations by the Treasury Department, not a single instance of failure by Halbach to correctly report and pay his income taxes was ever produced. In his pre-1934 tax return, Halbach consistently reported his total salary and bonus from GDC. After the Revenue Act of 1934, which authorized publication of corporate executives' compensation, Halbach objected, and thereafter reported his yearly GDC bonus as "Income from Foreign Interests." He continued to do this, and informed the Treasury Department investigator that he listed it that way to avoid public disclosure of his entire salary, plus bonus. There is no evidence that any charge was ever made that he ever violated the law or attempted to evade his liability for income taxes, based upon his full income. There is no better instance than this to illustrate how hard pressed defendant was in any effort to attack Halbach's character and integrity.

Defendant, by finally amending its answer, asserted a "Fourth Affirmative Defense" to the effect that plaintiffs had engaged in a conspiracy "to conceal, camouflage and cloak the ownership, control and domination" of GDC "by I. G. Farben." The purpose of the alleged conspiracy by plaintiffs was to conceal Farben's true beneficial ownership of GDC by placing the stock in the name of plaintiffs. To prove this as an affirmative defense, it was incumbent upon defendant to prove that plaintiffs were holding their stock as "cloaks" for Farben when the stock was vested in 1942 by the Alien Property Custodian. The argument by defendant in support of its conspiracy charge, insofar as Halbach is concerned, is a long and discursive reiteration of the same assertions relied upon by defendant to establish that Halbach was an enemy, ally or agent of an enemy, and that he had no beneficial ownership in the vested stock of GDC. The conspiracy charge against Halbach therefore fails for the same conclusions we hereafter reach that he was not an enemy, ally or agent of an enemy, and that he had full beneficial and legal ownership of the GDC stock when it was seized in 1942.

The remaining plaintiffs (or their predecessors) are also charged as being part of this conspiracy to conceal Farben's beneficial ownership of GDC. Defendant asserts as the basis for this charge that they had "basic knowledge and understanding" of the cloaking con-

spiracy between Farben and its corporate and personal representatives in the United States "from its very outset", and this links them to the conspiracy. Here again, defendant merely reiterates and reargues its previous assertions that these other plaintiffs were in reality fiduciaries and thereby infected with enemy taint, in an attempt to prove their knowledge of the conspiracy. Under these same facts and assertions we have concluded that, like Halbach, none of the other plaintiffs was an enemy, ally or agent of the enemy, and that they each possessed the legal and beneficial ownership of their GDC stock when it was seized in 1942. Thus, the conspiracy charges against these other plaintiffs must also fail.

Halbach's character and integrity are highly attested. William vom Rath was a former director and officer of GAF and his father was a co-founder of I. G. Farben. He was produced as a Government witness, and testified as follows:

"I would consider him (Halbach) as an outstanding honest businessman, who was looking after his success to be established in his life. He was responsible for the success of the sale of dyestuff in the United States, originally only imported, but later on supplemented by local production, integer in every respect.

\*      \*      \*      \*      \*      \*

\* \* \* Integer, that's a French word, 'integer.'

\*      \*      \*      \*      \*      \*

\* \* \* Integrity in every respect."

In Mr. vom Rath's words, Halbach had a reputation for being "utterly forthright" and "extremely proud of his achievement in his life and was guided by high ethical standards."

The testimony of Dr. Karl Milde, another Government witness, and assistant treasurer of GAF up to the time of its vesting in 1942, was to the same effect, as to Halbach's ability, integrity and independence. When questioned as to whether Halbach took orders, as it were,

from General Aniline or its management, he replied, "I think he ran his own ship."

The Shafer-Bledsoe Report of investigation of Halbach prepared for the APC; the testimony of Mr. Matthew J. Hickey, Jr., a Chicago financier brought in to GDC by Mr. Crowley after its vesting to serve later as its titular president, with Halbach continuing as chief executive; the testimony of Judge Burns, who made an investigation for the APC; the testimony of the APC, Leo Crowley, and several other witnesses was all to the effect that Halbach was an honest, forthright and highly capable businessman. None of these witnesses knew of any cloaking agreement, oral or written, between GDC, Halbach and Farben in 1939.

The Trial Commissioner, in reaching his conclusion that "Halbach's loyalty and patriotism were attested to by all who knew him," stated that as to Halbach's relationship with GDC, "[t]he picture of Halbach which emerges from this record is that of a capable businessman primarily loyal to the interest of his own company."

Before his death in 1958, Halbach was questioned by (1) the U.S. Department of Justice in 1941, (2) the U.S. Treasury Department in 1942, (3) the APC and his investigators in 1942–43, and finally (4) as a defendant in the 1952 trial under criminal indictment for conspiracy with Farben and others in restraint of trade, in which he was acquitted. He stated that he was General Manager of GDC in 1926 when the company was losing money and "I was the man that built the business and made it go." He stated that "[i]f they [I. G. Farben] were looking for anybody to front for them, they got hold of the wrong bird with me when I made the offer," i. e., to buy control of GDC. The final 1939 stockholders' agreement was "just so that the stock could never get out of the hands of the people who were working in the company and who were helping to build it up. And the idea was to perpetuate the company itself." He testi-

fied in the 1952 criminal trial, in which he was acquitted, that "[w]e were representing them or buying their goods, we were selling their goods, and all our contacts and all my contacts were with them on a buy and sell basis."

Despite the production by defendant of hundreds of secret documents from the Nazi Government and Farben files dealing explicitly with Farben's cloaking operations, and the production of high-ranking Farben and German Government witnesses, there is absolutely no direct evidence in this record that when Halbach acquired majority control of GDC, he was a party to any agreement or understanding, written or oral by which Farben might obtain postwar control of GDC.

Farben may well have believed that when it gave up all control, direct or indirect, over GDC, Halbach was its trusted friend, its *vertrauensmann*. However, defendant, in asserting that Halbach was thereby its secret agent, entrusted with legal but not beneficial ownership in order to return control of GDC to Farben after the war, overlooks the definition and distinctions as to a *vertrauensmann*, as expressed by Dr. Kurt Krueger, heretofore described as a former director and high official of Farben, and the individual primarily responsible for Farben's subsequent actions with respect to GDC and Halbach. He was called from Germany by the Government to testify as its own witness.

Dr. Krueger made a clear distinction between a *vertrauensmann*—"a man of confidence," who was "something more than a trustee." He named several U.S. *vertrauensmann*, including Halbach whom he described as "a real man of confidence on the basis of experience of many years." The following is excerpted from the transcript of Dr. Krueger's testimony:

Q. By the word "verdrauensman" [sic], you did not mean to imply, did you, disloyalty to America by an American citizen?

A. I only meant loyalty toward I. G. Farben.

Q. In a commercial sense, is that right?

A. In a commercial sense, yes. And the loyalty toward his country was of great interest for us also.

Q. Did you want your verdrauensmen [sic] to be loyal to Germany and not to the United States, for example?

A. No, to the contrary.

Q. To the contrary?

A. Loyal to his country, and at the same time loyal to the I. G. as high as possible without damaging the loyalty toward his country.

    *    *    *    *    *    *

A. * * * The most important point was that we could rely on their loyalty in commercial affairs, *that they did not deal and dispose of their shares against the interests of I. G.* For instance, they would not sell *their* shares to our competition firms, as Allied Chemical or duPont or so on. * * * [Emphasis supplied.]

    *    *    *    *    *    *

Q. Did you also stress in your negotiations with the Ministry of Economics the fact that independent shareholders in foreign countries, like England for example, could not be expected to lie, tell an untruth to their Government, *therefore there should be no secret agreements between them and I. G. Farben?* [Emphasis supplied.]

A. I stressed that, that you asked me.

Q. That is correct, you stressed that as the point of view of I. G. Farben?

A. Of I. G. Farben.

This in essence was the plan adopted by the Ministry of Economics as "an act of desperation" when war became imminent in 1937–38, as Dr. Krueger testified. The very next year Farben,

through its subsidiaries, for the first time had the GDC stock released from escrow and free from prior options which would enable Farben or its subsidiaries to repurchase the stock, in order to convey the majority of the GDC stock without any secret cloaking or secret agreements. This transaction follows the plan outlined by Dr. Krueger almost to the letter: *total release to Halbach solely as a vertrauensmann*, and to the other shareholders, under the assumption that they would not deal and dispose of the GDC stock against the interests of Farben. Defendant insists that it would be incredible to believe that Farben intended in 1939 to convey the GDC stock outright for $100 per share; that there must have been a secret understanding or conspiracy with Halbach to cloak the transaction so that Halbach and the other GDC shareholders obtained only legal title while Farben retained the true "beneficial ownership." This would indeed, be a compelling inference or conclusion, except for the fact that the actual Farben plan adopted in 1938, and as explained by the man responsible for its formulation, expressly required that there was to be no secret agreement with the *vertrauensmann* that would require them to lie to their own country about who really owned the stock. This may have been an "act of desperation" in 1939, but it was adopted by Farben and the Ministry of Economics out of sheer and compelling necessity in the face of war and the possibility of seizure and loss of cloaked companies abroad.

### Enemy Status

The nature of a claimant's burden in a § 9(a) lawsuit has been aptly summarized by the Second Circuit Court of Appeals in Manufacturers Trust Co. v. Kennedy, 291 F.2d 460 (2d Cir. 1961) at 462:

> * * * Section 9(a) of the Act requires one claiming property vested by the Alien Property Custodian, to show, first, that he is "not an enemy or an ally of enemy," and second, that he has an "interest right or title" in

the vested property in order to secure its return. * * *

Therefore, the next inquiry must be whether plaintiffs have established "non-enemy" status. In this connection, it is important to consider § 2 of the Act wherein the terms "enemy" and "ally of enemy" are defined. The pertinent provisions of the Act are quoted in the Appendix at the end of this opinion, and it will be noted that the only provision which would permit a resident United States citizen to be deemed an enemy (or ally thereof) is subsection (b) in a case where such citizen is an "officer, official, agent, or agency" of a *government* "with which the United States is at war." It is certainly clear on this record that whatever their business relationship may have been with I. G. Farben, no plaintiff herein was ever an officer, official, or agent of the German Government. Indeed, it does not appear that defendant contends to the contrary, other than to argue that Halbach and Duisberg were "agents of I. G. Farben" and as such, infected with enemy taint. However, the two considerations differ. An "agent" of the German Government after December 1941 would be barred under the § 2(b) definition of enemy from recovering any seized property, even if he were the real and *bona fide* owner of the property. An "agent" of I. G. Farben would not be so barred (*a fortiori* if the agency was entirely pre-war), although such an agency relationship would certainly be relevant to the question of his *bona fide* ownership. *See*, La Due & Co. v. Rogers, 259 F.2d 905 (7th Cir. 1958). Plaintiffs acknowledge that if their *ownership* was in any way "enemy tainted" by cloaking or similar device, they are not entitled to recover as beneficial owners of their stock.

The doctrine of "enemy taint" is a judicial creation which was originally developed by the Supreme Court to pierce the veil of a neutral (Swiss) corporate claimant. Clark v. Uebersee Finanz-Korp., 332 U.S. 480, 68 S.Ct. 174, 92 L.Ed. 88 (1947). In overruling one of its prior decisions, the Court held that

a corporation, even though incorporated in a neutral country, and doing no business in an enemy country, might nevertheless be ineligible to recover under § 9(a) if its stockholders were enemies. A trial on that question was thereafter held. The District Court found that the beneficial stockholders were German citizens and that, therefore, the corporation was enemy tainted and could not recover. Uebersee Finanz-Korp. v. Clark, 82 F.Supp. 602 (D.D.C.1949), aff'd Uebersee Finanz-Korp. v. McGrath, 88 U.S.App.D.C. 182, 191 F.2d 327 (1951).

The case then went to the Supreme Court a second time, and the Court affirmed the decisions below in favor of the Custodian. Uebersee Finanz-Korp. v. McGrath, 343 U.S. 205, 72 S.Ct. 618, 96 L.Ed. 888 (1952). The Court said at 343 U.S. 212, 72 S.Ct. 621:

> * * * As construed by this Court in Clark v. Uebersee Finanz-Korp., A. G., *supra*, § 2 included in the word "enemy" all corporations affected with an "enemy taint." Since we find petitioner to be so affected because of the direct and indirect control and domination by an enemy national. Wilhelm von Opel, petitioner cannot recover under § 9(a).

In another case decided on the same day, the Supreme Court held that even though the corporate veil can be pierced, so that a neutral corporation may be tainted by its enemy stockholders, nevertheless "innocent" (non-enemy) stockholders are entitled to intervene and protect their pro-rata share of the corporation's vested assets. Kaufman v. Societe Internationale, 343 U.S. 156, 72 S. Ct. 611, 96 L.Ed. 853 (1952).

The "taint" doctrine as developed by the Supreme Court therefore is nothing more than the application of the non-enemy and ownership tests to the stockholders of a corporate claimant. In other words, the stockholders as well as the corporation have to meet the § 9(a) requirements where the corporation is the claimant. To apply the doctrine to individual claimants would be entirely redundant since they must meet the non-enemy and ownership tests in their own right.

However, defendant appears to carry these principles one step further by arguing for "enemy taint" on all GDC's stock simply because of Halbach's long-standing business relations with I. G. Farben. It is clear that Halbach over the years had many commercial dealings with I. G. Farben, GDC's principal supplier of foreign dyestuffs of a quality not otherwise available through domestic sources. Such dealings, however, dwindled after September 1939, and ceased entirely before December 1941.

The immediate question here is not whether GDC or Halbach ever acted as an "agent" of I. G. Farben, but whether Halbach's connection with the GDC stock held in trust for his wife and daughters at the time of its seizure in 1942 was as "agent" for I. G. Farben. Defendant offered no credible evidence from which such an "agency" could even be suspected or should be inferred.[15]

Defendant cites von Clemm v. Smith, 255 F.Supp. 353 (S.D.N.Y.1965), aff'd 363 F.2d 19 (2d Cir. 1966), as a case where von Clemm was found to be "an agent of the German Government * * on far less extensive activity" than Halbach's.

The District Court in finding von Clemm to have been an agent of the German Government noted: (1) "von Clemm's dealings were more than the normal operations of an American citizen engaged in the import business solely for the purpose of private gain"; (2) in certain diamond transactions, "he acted on behalf of the German Government"; (3) "[t]he diamond transactions

---

15. The creation of the irrevocable family trust itself makes any such agency highly improbable as Halbach was neither a trustee nor beneficiary. Indeed, the only "connection" was that GDC's option could be triggered by Halbach's death or complete retirement as both employee and director of the company.

were carried out at the instigation and direction of the German Government, for the purpose primarily of securing this dollar exchange"; (4) "[h]e gave advice to his 'tanwo friends' (*i. e.*, the German Economics Ministry), on how to conduct 'economic warfare'"; and (5) "[h]e knew that at least some of the dollars that he paid for the stones ultimately were deposited to the credit of the German Navy." 255 F.Supp. at 368–369.

The foregoing established that von Clemm was an agent of the German Government up to December 11, 1941, and thus an "enemy" under § 2(b), ineligible for relief under § 9(a) regardless of his ownership of the vested diamonds and other property. While the intervention of the war frustrated his continuance of these full activities, the District Court found that they were not discontinued entirely, and that he therefore became an "enemy" agent.

The contrast between von Clemm's activities for the German Government and Halbach's leadership of GDC (which continued on for eight years after the 1942 seizure) is obvious.

As an essential part of plaintiffs' burden of proof of "non-enemy" status, they must prove that Ernest K. Halbach who controlled the operaton of GDC as a majority stockholder and officer, was not an enemy, or an agent of the enemy when GDC was vested in 1942.

Regardless of whatever opinions Farben may have entertained as to whether Halbach was its "trusted friend" or *vertrausensmann*, while at the same time remaining a loyal, respected citizen of the United States up to 1942, any basis for a continued belief in this theoretical ambivalence certainly ended with the U. S. declaration of war when Germany and Farben then became the enemy. Defendant asserts, and has attempted to prove that Halbach was an enemy, or an agent or ally of the enemy, or a conspirator with the enemy.

Nevertheless, defendant has repeatedly asserted in briefs and oral argument that "the loyalty of Halbach is not an issue in this case"; despite inferences and conclusions drawn by defendant from the evidence which clearly impugn and disparage not only Halbach's character, but his loyalty as a native-born American citizen. We are called upon to decide whether or not Halbach was an enemy of the United States, and since we consider that being loyal to one's country is the direct antithesis of being its enemy, we must reject the paradoxical disclaimer by defendant that "the loyalty of Halbach is not an issue in this case."

The picture of Halbach which emerges from this record is that of a capable businessman primarily loyal to the interests of his own company. Insofar as his feeling towards this country was concerned, Halbach's loyalty and patriotism were attested to by all who knew him, including the Government witnesses, and by the fact that, unlike personnel discharge actions taken by the Government upon its seizure of GAF, Halbach and all other key employees of GDC were retained by the Government to manage the affairs of GDC for many years after its seizure. Further, in this connection, it should be mentioned that Halbach was a valued and respected member of the Dyestuff Industry Manufacturers Advisory Committee to the Dye and Textile Branch of the War Production Board. The director of that branch considered Halbach to be an indispensable member of the Advisory Committee.

In addition, on December 20, 1945, the Director, Military Planning Division, Office of the Quartermaster General, wrote Halbach a letter of "appreciation and commendation to you and the personnel of your company for the many contributions afforded the Quartermaster Corps during the past few years." The Director concluded by saying:

I personally want you to know that your many contributions will long be remembered and recognized by the Quartermaster Corps as playing a vital part in the total effort to help bring victory to our Country. It is hoped

that you will continue to be interested in our postwar program of improving existing Quartermaster items and in research and development on new ones.

Mr. Leo Crowley,[16] the Alien Property Custodian who vested the stock of GDC, ordered a thorough investigation of Halbach in 1942. He stated before the Senate Judiciary Committee on July 22, 1953: " * * * we found no evidence anywhere, where anyone could cause any criticism to be made against Mr. Halbach's integrity or against his patriotism."

William vom Rath, a former director and officer of Farben's GAF, who in 1942 was called as a witness for defendant, testified that Halbach's loyalty to the United States was never doubted. He agreed with the testimony of Dr. Max Ilgner (a director of I. G. Farben) who had said in another case, "He (Halbach) was 100% American, but a fine, fine chap."

Karl F. Milde was an assistant treasurer of GAF who, like vom Rath, was asked to resign after its 1942 vesting. He testified that Halbach "ran his own ship" and when asked if he considered Halbach a loyal American citizen, he stated that "there was absolutely nothing that I know of that would indicate the contrary."

The Shafer-Bledsoe Report prepared by investigators at the direction of the Alien Property Custodian in 1942, quotes Mr. Hugh Williamson, Vice President of GAF, as stating that Mr. Halbach is "an honorable American citizen who was an outsider to the inner workings of 'the fabulous picture' of I. G. Farben in America."

Accordingly, we conclude as to this issue that plaintiffs have met their burden of proof; that none of them or their predecessors in interest was an enemy, or the agent or ally of an enemy within the meaning of the Act.

To Leo Crowley, the distinguished Alien Property Custodian, who seized GDC's stock, the final conclusion was that there had been committed "one of the most grievous mistakes ever made—and never corrected—by the Office of Alien Property Custodian, *i.e.*, the retention of the stock after the war."

Pursuant to the authority conferred upon it by the Congress, this court should now correct that longstanding injustice by the entry of judgments for plaintiffs as set forth at the end hereof.

### Interest

Plaintiffs contend that they are entitled to interest on the allocated sales proceeds of their shares from March 1965 (when the Attorney General sold GAF) to the date of judgment herein "at a minimum rate of five percent per year." The extent of defendant's liability for interest on any adverse judgment rendered by this court is clearly defined in 28 U.S.C. § 2516 (1964), which states in part:

(a) Interest on a claim against the United States shall be allowed in a judgment of the Court of Claims only under a contract or Act of Congress expressly providing for payment thereof.

Recognizing these statutory limitations, nevertheless, plaintiffs offer three alternative theories of recovery in support of their claim. Counsel for plaintiffs have first referred to eminent domain cases in which the United States Supreme Court has held that the addition of interest is a necessary part of "just

---

16. It is a matter of general and common knowledge that in 1942, Leo Crowley was one of the nation's foremost financiers and business executives. He served in the Roosevelt Administration from 1933 to 1945 as first Chairman of the Federal Deposit Insurance Corporation, after the banking crisis of 1933. Later, he served as Administrator of the Foreign Economic Administration, including our entire Lend-Lease Program of Aid to the Allied Nations of Europe, and also as Alien Property Custodian. It is also a matter of public record and common knowledge that he performed these high and exacting responsibilities to the nation, involving many billions of dollars, with sound and careful business judgment.

compensation." *See,* Seaboard Air Line Ry. v. United States, 261 U.S. 299, 43 S.Ct. 354, 67 L.Ed. 664 (1923). However, this is not a "just compensation" case. These plaintiffs have never filed with this court "an election to waive all claims to the net proceeds" of any sale and "to claim just compensation instead." 50 U.S.C.App. § 9(a) (1964). Their claim is to an allocated part of the "net proceeds" of the 1965 sale, and not merely to "just compensation."

Secondly, plaintiffs rely on the Supreme Court case of Henkels v. Sutherland, 271 U.S. 298, 46 S.Ct. 524, 70 L.Ed. 953 (1926). In *Henkels,* the property of an American citizen was mistakenly seized by the Alien Property Custodian during World War I, and sold as enemy property. The proceeds were deposited with the Treasurer of the United States, and were invested by him in interest-bearing Government securities. Ultimately, Henkels was adjudged to be the sole owner of the liquidated stock and was paid the principal amount realized from the sale. An action was filed under § 9(a) of the Trading With the Enemy Act to recover the income realized from defendant's investment of the principal sum. Holding that Henkels was entitled to an accounting for the interest derived from said investments, the Court stated:

> The Government cannot be sued without its consent, and accordingly *it cannot be sued for interest unless it consents to be liable therefor. But the claim here is not for interest* to be paid by the United States in the sense of the rule. It is for income, derived from an investment of Henkels' money in obligations of the United States, *which income has been actually received by the Treasury and is in its possession,* to be held, as the proceeds themselves are to be held, for the account of the Alien Property Custodian. [Emphasis supplied] 271 U.S. at 301, 46 S.Ct. at 526.

The Court's primary concern was that the Government should not receive the income it had obtained as an increment to illegally-vested property and thus prevent unjust enrichment. Further, the unequivocal language of the opinion, as recited above, specifies that the claim was not regarded as one for interest as is the case here. Henkels merely recovered the income derived from post-sale investments which had been physically received by defendant for its own benefit. So far as the record in this case discloses, however, no *Henkels* situation exists. In answer to an inquiry by plaintiffs' counsel, the Government responded (without apparent contradiction) as follows:

> The proceeds of sale of the General Aniline & Film Corporation stock have been placed in the Alien Property World War II account in the Treasury Department and have been commingled with all other Alien Property funds arising out of World War II vestings. No segregation or other separation of the proceeds of the sale of the General Aniline & Film Corporation stock has been made. Although moneys are disbursed from the account from time to time to successful claimants and the Foreign Claims Settlement Commission, ample funds remain to satisfy all pending claims, including those of your clients.

> Regarding your inquiry concerning whether these funds have yielded any interest, income, or economic benefit to the United States, we can only say that the funds are in the account and are not accruing any interest, income, or economic benefit to the Alien Property Custodian.

We conclude therefore that plaintiffs' reliance on *Henkels* is misplaced. A careful analysis of that decision yields no reasonable basis upon which plaintiffs may recover the interest sought.

Plaintiffs' final argument for interest requires us to consider the 1962 amendment to § 9(a) of the Act which directs that the proceeds of sale "shall be held *in trust* by the Secretary of the Treasury", [Emphasis supplied], 50 U.S.C.

App. § 9(a) (1964), in conjunction with 31 U.S.C. § 547a (1964), which provides:

*All funds held in trust* by the United States, and the annual interest accruing thereon, when not otherwise required by treaty, *shall be invested* in stocks of the United States, bearing a rate of interest not less than 5 per centum per annum. [Emphasis supplied.]

From these statutes and some familiar principles of trust law regarding the obligation of a trustee to invest trust funds (see Restatement, 2d, Trusts § 181), plaintiffs' counsel conclude that the Government has been under a duty to invest the sales proceeds in question, and that, if the Government has not done so, then it has been enjoying "the economic benefits of an interest-free loan." To this argument, we have two responses. First, § 9(a) of the Act could have specifically referred to 31 U.S.C. § 547a, or required the Treasurer to invest the proceeds of any sale or liquidation. However, that section makes no such reference, and we regard this as a strong indication that Congress intended to limit recovery to the allocated sales proceeds. Second, and most importantly, this question was carefully considered in Gmo. Niehaus & Co. v. United States, 373 F.2d 944, 179 Ct. Cl. 232 (1967), which was decided after the Act was amended in 1962, and it was answered adversely to plaintiffs' contentions. *Niehaus* involved the recovery of damages by plaintiffs on a claim for the value of money or property unlawfully appropriated by vesting under the Trading With the Enemy Act. Particularly pertinent is the court's discussion of defendant's liability for any post-sale increment. In that regard, the court stated:

In this connection, it should be noted that Section 7(c) of the Trading With the Enemy Act, as amended (50 U.S.C.App. § 7(c) (1964)), provides that in a case involving the unlawful vesting and the subsequent sale by the Alien Property Custodian of the property of a person who was not an enemy national, any recovery by the owner of the property "shall be limited to and enforced against the net proceeds received therefrom and held by the Alien Property Custodian or by the Treasurer of the United States." * * Although this limitation of the Trading With the Enemy Act may not be strictly applicable in terms to plaintiffs' case, we should be governed by *its indication of the Congressional policy as to maximum recovery. Neither the post-sale increment in value nor interest is recoverable under Section 7(c), and neither should be recoverable here. Cf.* Sac & Fox Tribe of Indians of Oklahoma v. United States [383 F.2d 991, 179 Ct.Cl. 8, 24], decided this day, Part VI of that opinion.

\* \* \* \* \* \*

\* \* \* In non-eminent domain cases the normal rule is that interest is not recoverable unless authorized by statute or contract. 28 U.S.C. § 2516 (a). In this instance there is neither statutory nor contractual authorization. *On the contrary, Section 7(c) of the Trading With the Enemy Act looks the other way.* [Emphasis supplied.] 373 F.2d 961–962, 179 Ct.Cl. at 262–263.

Plaintiffs allude to certain factual differences between *Niehaus* and the instant case, but none dilute the full force and effect of the court's general interpretation of § 7(c) of the Act.

■ In the absence of compelling evidence to the contrary, we must always be guided by the Congressional intent which, in this instance, is clearly that the Government must specifically consent to be liable for interest in express terms, rather than by implication, except in the most extreme cases, such as *Henkels*, in which an alternate approach is desirable and necessary to avoid a serious inequity, *i.e.*, unjust enrichment. Therefore plaintiffs are not entitled to interest on the allocated sales proceeds of their shares of GDC stock.

**574**

### Prior Settlements

Having held that plaintiffs are entitled to recover, without interest, we must now compute the proper measure of their relief. After all GDC stock was finally vested, each plaintiff herein filed with the APC a notice of claim with respect to their individually-owned shares of stock. Upon denial of those claims, an action was filed in District Court which sought the recovery of that portion of the vested stock and dividends thereon to which each plaintiff claimed to be entitled. Subsequently, plaintiffs settled their claims and executed releases during January and February 1945, with the exception of Plaintiff St. George who settled in February 1951 for a far greater amount. Specifically, the 1945 settlements provided for the payment to plaintiffs of $100 per share plus six percent interest from the date of the last dividend. Six years later, the widow of Dr. St. George agreed to accept $365 per share in settlement of her deceased husband's claim. All sums received by plaintiffs were paid in their entirety from GDC cash dividends which had been declared and paid to the APC.

50 U.S.C. App. § 42(a) (1964) provides in pertinent part:

> Notwithstanding any statute of limitation, lapse of time, any prior decision by any court of the United States, or any compromise, release or assignment to the Alien Property Custodian, *jurisdiction is hereby conferred* upon the United States Court of Claims to hear, determine, and render judgment upon the claims against the United States for the proceeds received by the United States from the sale of the property vested under the provisions of the Trading With the Enemy Act * * *. [Emphasis supplied.]

■ Clearly, this Act confers jurisdiction upon this court to conduct a trial *de novo* notwithstanding any prior event or decision. However, we do not view this provision, nor do we interpret the Congressional intent, as granting a mandate to absolutely disregard any action taken prior to the Court of Claims suit which may be relevant to the proper formulation of our judgment. Stated quite simply, our primary concern is always to render justice in the particular cause under deliberation. As is the case here, circumstances may require consideration of any previous transaction between the parties which is particularly pertinent to the case in suit, and its interrelationship with our forthcoming decision.

■ Inasmuch as justice in this case requires recompense for plaintiffs' losses but by no means requires double recovery (a result which should be avoided whenever possible), we must give force and effect to any arrangement heretofore agreed upon. Accordingly, we hold that defendant is entitled to fully offset those amounts previously secured by plaintiffs in settlement of their claims against any monetary judgment now rendered by this court.

After the Attorney General caused GDC to be merged into GAF in 1954, there was a recapitalization and reclassification of GAF stock in 1964, as described previously. By reason of this merger what the Attorney General sold in 1965 was not plaintiffs' vested property, as such. The sales proceeds of over $329,000,000 received by him in 1965 came from the public sale of GAF's reclassified stock at $29.476 per share. By a tracing process, however, plaintiffs have satisfactorily shown a proper allocation of the portion of those sales proceeds attributable to the vested GDC shares. Allocating the said $29.476 purchase price per share of GAF stock to the vested GDC shares as registered in the names of plaintiffs, as adjusted and computed by the Trial Commissioner, results in the attribution of the 1965 sales

proceeds of the GAF stock to the vested GDC shares of plaintiffs. The "sales proceeds" listed in our findings are "the proceeds received by the United States from the sale of the property vested * * * by vesting orders numbered 33 * * * " as contemplated by 50 U.S.C. App. § 42(a), and accordingly, each plaintiff (or his successor in interest) is entitled to judgment in the amounts hereinafter set forth opposite the name of each, less adjustments for each plaintiff's prior settlement.

The Commissioner has previously computed the proper amount to which each plaintiff is now entitled. In addition, the terms of the 1945 and 1951 settlements are part of this record. Hence, it is not necessary to return these proceedings to the Commissioner for further consideration on the matter of damages, particularly since no computation of interest is involved. The chart which follows clearly outlines the total recovery due each plaintiff in accordance with our judgment:

| Name of plaintiff | GDC vested shares | Sales proceeds of GDC stock received by Attorney General | Previous settlements to be offset against sales proceeds | Total recovery |
|---|---|---|---|---|
| J. Robert Bonnar | 60 | $ 198,963.00 | $ 7,080 | $ 191,883 |
| Ann H. Bumsted | 2,362.5 | 7,834,168.13 | 278,775 | 7,555,393.13 |
| Charlotte A. Herrmann, as Executrix of the Estate of Henry E. Herrmann. | 30 | 99,481.50 | 3,540 | 95,941.50 |
| Mary Elizabeth Kemmerer | 2,362.5 | 7,834,168.12 | 278,775 | 7,555,393.12 |
| Louise D. Kuttroff and Monroe Percy Block, as Executors of the Estate of Percy Kuttroff. | 225 | 746,111.25 | 26,550 | 719,561.25 |
| Madeleine L. Hillsinger, as Executrix of the Estate of Florence F. LaVallee and/or The Peoples Banking & Trust Co., a Trustee under the Will of George. A. LaVallee, as their interests may appear. | 50 | 165,802.50 | 5,900 | 159,902.50 |
| Gertrude Lenz as Executrix of the Estate of Rudolph Lenz. | 400 | 1,326,420.00 | 47,200 | 1,279,220.00 |
| Joseph W. Martin and the Nat'l State Bank, Elizabeth, New Jersey, as Executors of the Estate of H. Walford Martin. | 350 | 1,160,617.50 | 41,300 | 1,119,317.50 |
| Emily Margaret St. George | 750 | 2,487,037.50 | * 273,750 | 2,213,287.50 |
| Lennart Swenson | 73 | 242,071.65 | 8,614 | 233,457.65 |
| Elizabeth L. Wingender, as Executrix of the Estate of Anthony T. Wingender. | 40 | 132,642.00 | 4,720 | 1127,922.00 |

* Computed on the basis of $365 per share. All other settlements computed on the basis of $100 per share plus six percent interest.

Having rendered judgment for plaintiffs and having offset their previous settlements against the forthcoming judgments, defendant's counterclaim for return of monies previously paid in pursuance of those settlements heretofore described is now moot and, accordingly is dismissed.

## CONCLUSION

Upon the findings of fact and opinion which are made a part of the judgments

herein, the court concludes as a matter of law, that each plaintiff (or successor in interest) is entitled to recover of and from the United States, as follows:

| Name | Amount |
|------|-------:|
| J. Robert Bonnar | $ 191,883.00 |
| Ann H. Bumsted | 7,555,393.13 |
| Charlotte A. Herrmann, as Executrix of the Estate of Henry E. Herrmann | 95,941.50 |
| Mary Elizabeth Kemmerer | 7,555,393.12 |
| Louise D. Kuttroff and Monroe Percy Block, as Executors of the Estate of Percy Kuttroff | 719,561.25 |
| Madeleine L. Hillsinger, as Executrix of the Estate of Florence P. La-Vallee and/or The Peoples Banking & Trust Co., a Trustee under the Will of George A. LaVallee, as their interests may appear | 159,902.50 |
| Gertrude Lenz, as Executrix of the Estate of Rudolph Lenz | 1,279,220.00 |
| Joseph W. Martin and The Nat'l State Bank, Elizabeth, New Jersey, as Executors of the Estate of H. Walford Martin | 1,119,317.50 |
| Emily Margaret St. George | 2,213,287.50 |
| Lennart Swenson | 233,457.65 |
| Elizabeth L. Wingender, as Executrix of the Estate of Anthony T. Wingender | 127,922.00 |

Judgments are hereby entered for total recovery to each plaintiff (or successor in interest) in the amounts shown by the above table with said judgments to be satisfied from the special account maintained by the Secretary of the Treasury pursuant to Section 9(a) of the Trading With the Enemy Act as amended (50 U.S.C. App. § 1, et seq.)

It is also concluded that defendant is not entitled to recover on its counterclaim and said counterclaim is dismissed.

SKELTON, Judge (dissenting):

This case is a classic example of a German cloaking operation. It is characterized by long years of careful planning, extraordinary foresight, devotion to detail, and the complete cooperation of those who participated in the plan. From the beginning, the Germans counted on the gullibility of Americans, their tendency to forgive and forget, and their sense of justice and fair play, for the success of the undertaking. It now appears that after all of these years the teutonic faith in these typically American traits was well-founded and that their meticulously planned and executed cloaking scheme is about to bear fruit. I cannot in good conscience be a party to it.

The record is so voluminous that it is impossible for me to comment on all the facts in the case. Our able Trial Commissioner, Lloyd Fletcher, has set forth most of the facts in his opinion and findings of fact, containing 81 printed pages, and I will rely on them for the most part, although I differ with many of the conclusions made by him from the facts. This is especially true as to his ultimate conclusion that the plaintiffs are entitled to recover $22,227,483.15, in addition to the sum of $1,041,360 heretofore paid to them, from the United States. The commissioner was confronted with a monumental task, especially with most of the witnesses having knowledge of the facts being dead and other evidence being unobtainable at the time of trial. He discharged his duties in a conscientious and commendable way, and was forthright in his opinion when he said:

\* \* \* I am charged with the duty of resolving the polar positions taken by the parties. I have done so to the best of my ability and without any really deep-seated conviction that I am right. \* \* \*

Most of my differences with the commissioner's opinion and findings of fact are with reference to the findings and conclusions based thereon after August 1, 1939, the date E. K. Halbach acquired legal title to 1,200 additional shares of GDC stock, which gave him control of the company. (See finding 62.) Prior to that date, there is not much dispute about most of the facts nor the inferences to be drawn therefrom. There are some exceptions, of course, which will be discussed later. The majority has, for the most part, adopted the opinion and findings of the commissioner as the opinion of the court.

The plaintiffs have objected to the consideration of any facts prior to the time Halbach acquired control of GDC and have referred to such events as

"ancient history." This objection is ill-founded. The history of the company and its relationship and connections with I. G. Farben (Farben) from the beginning up to the date of vesting in 1942 must be looked to in order to understand how the beneficial ownership of GDC was cloaked for Farben, and how the plaintiffs (especially Halbach) were involved in the plan.

We start with the formation of GDC in 1925 as a New York Corporation by H. A. Metz & Co. (the U. S. sales representative of German Hoechst), Kuttroff, Pickhardt & Company, Inc. (the U. S. sales representative of German Badische) and Grasselli Dyestuff Corporation (later to become known as General Aniline & Film Corporation (GAF)). The incorporation was taken care of by H. A. Metz, a *vertrauensmann* (a trusted representative) of German Hoechst. Each of the three German companies were allotted 2,000 shares of GDC and Metz was the first president and later the majority stockholder. Thus, it may be seen that in the beginning the company was completely German from every standpoint, except its incorporation in New York.

Ernest K. Halbach had been a long time employee of Kuttroff, Pickhardt & Company prior to the time GDC was organized. He became an employee, stockholder, and director of GDC soon after it was formed. He originally purchased 500 of its shares of stock. He was invited to become a stockholder and a member of the original executive committee at the request of the German company Badische.

It should be pointed out that late in 1925 the three leading chemical and dyestuffs manufacturers in Germany, Bayer, Badische, and Hoechst combined their companies to form the I. G. Farben cartel. The wealth and influence of this cartel in Germany and around the world was so tremendous that it became the mainstay of Hitler and his Nazi government. It is doubtful if Hitler could have embarked on his program of world conquest in the second World War without its help. About nine months after GDC was formed, all its stockholders (including Halbach) executed option agreements, without consideration, on their stock to I. G. Farben. In brief, these options provided that Farben, on demand, could acquire all the stock at a price of $100 per share, plus six percent interest, and that the stock certificates would be held in escrow by Farben's designee. In my opinion, the beneficial ownership of all the GDC stock in excess of $100 per share plus six percent passed to Farben at that time, where it remained until it was vested by the APC in 1942.

In the meantime, GDC became the exclusive importer and sales organization of Farben in the United States.

In 1931, H. A. Metz, the majority stockholder of GDC at that time sold his 4,100 shares to D. A. Schmitz, the brother of Hermann Schmitz, who was the chief executive officer of Farben. These shares were subject to Farben's option, were endorsed in blank, and deposited in escrow with Farben's New York attorneys, Briesen & Schrenk. The trial commissioner found that D. A. Schmitz was a principal *vertrauensmann* of Farben, and, through his brother, was at all relevant times controlled by Farben.

In passing, it should be noted that H. A. Metz was a former Congressman from New York who, during World War I had his dyestuffs stocks in a sales company seized by our government on the ground that it belonged to his supplier Hoechst in Germany. After the war the property was ordered returned to him by a court judgment because at that time under the provisions of Section 2 of the Trading With the Enemy Act, the APC lacked power to seize the American assets of an enemy when the enemy had placed them in a neutral or American company in exchange for its shares. *See,* Behn, Meyer & Co. v. Miller, 266 U.S. 457, 45 S.Ct. 165, 69 L.Ed. 374 (1925); and Hamburg-American Line Terminal & Navigation Co. v. United States, 277 U.S. 138, 48 S.Ct. 470, 72 L.Ed. 822

(1928). Metz, in return for his expenses, after recovering his shares of stock "placed them again" at the disposal of (German) Hoechst, along with certain patents of Hoechst he had bought from the APC. This incident was cited by Farben on July 24, 1939, in its request to the Reich Ministry of Economics entitled "Measures to protect the stockholdings of our foreign sales companies" for permission to cut all legal 'ties between Farben and the stockholders and place the companies in the hands of trusted persons who would, if the occasion required it, do as Metz had done. (See finding 49.) This was the pattern for Farben's cloaking operations in the United States and around the world. We will now see how the plan unfolded and worked with respect to the cloaking of GDC.

There is no question but what H. A. Metz was holding his 4,100 majority controlling shares of GDC for the absolute control of the company by Farben. His sale of these shares to D. A. Schmitz did not change this situation. Schmitz held the stock as a nominee of Farben.

D. A. Schmitz formed a holding company named The Marion Company (Marion) on November 25, 1931, for the purpose of holding options on the stock of GDC and other Farben-controlled companies. On June 23, 1933, the original options held by Farben on all the GDC stock were cancelled and new options of the same tenor ($100 per share plus 6 percent) were obtained in favor of Marion from all the GDC stockholders (including Halbach), without consideration either for Farben's cancellation of its options or for the new ones to Marion. All the stock was held by Farben's New York lawyers, Briesen & Schrenk. At the same time, Marion obtained similar options from other companies, including Chemnyco, Inc. To complete the picture, Marion's shares were optioned to Greutert, a Swiss bank, which held them for the benefit of Farben. The net effect of the whole transaction was to remove Farben's name from the options in this country and to substitute that of Marion

therefor, but Farben ultimately remained in control of GDC and could take over the shares and the company any time it wished.

The above arrangement continued until 1938 when the options Marion held on GDC stock were cancelled without consideration, although the book value was considerably more than $100 per share. In August 1938, all of the shareholders (including Halbach) of GDC executed the same type of options in favor of Chemnyco without consideration. The shares were endorsed in blank and deposited with Briesen & Schrenk, Farben's attorneys in New York. The Marion Company was insolvent and formally dissolved June 28, 1939. All its assets were delivered to Chemnyco which assumed its debts and liabilities. This changeover was made to eliminate prominent German names like Schmitz, Duisberg and vom Rath, who were connected by family relationships with Farben. Chemnyco was as much under option to Greutert as was Marion and was thereby controlled by Farben, but it did not outwardly appear to be connected with Farben.

A word more should be said about Chemnyco. It was originally founded in 1930 by Dr. Wilfrid Greif under the name of U. S. & Transatlantic Service Corporation. Dr. Greif was the personal representative of Farben in the United States. In 1931, the name of the company was changed to Chemnyco. The company was a service organization designed to replace Dr. Greif as the representative of Farben in the United States. It was supported by annual retainers from Farben (from $84,000 to $195,000) and by Kalle & Co. and Greutert for lesser amounts. It was controlled by Farben.

It is clear that these transactions involving Farben, Marion, Chemnyco, and Greutert could have no meaningful purpose except to carry out a preconceived cloaking scheme by concealing the ownership and control of GDC by Farben. Before these events took place, Farben had the beneficial ownership of the com-

pany, and after they occurred it still had such ownership and could take over at any time. It is obvious that Farben was engaging in a clever and complicated cloaking scheme to hide its interest and control of GDC. Furthermore, it is significant that the stockholders of the company (including Halbach) were cooperating to the fullest extent.

In the meantime, war clouds began to gather on the horizons of Europe and it appeared that another World War was imminent. The Germans, who were madly preparing for the coming holocaust, had learned many lessons from World War I in the field of economic warfare. They remembered how enemy property was seized in the United States, and, where possible, was sold or otherwise disposed of to the detriment of Germany. They realized, too, that the Trading With the Enemy Act in existence during the first World War would no doubt be amended and that even though the beneficial ownership of American property might be in Germany with legal title in a corporation in a neutral country or in America, there would probably not be another successful "H. A. Metz case," as described above. By this time, they had concluded that the Americans had become educated in economic warfare and had learned the "tricks of the trade" just as the Germans had, and that to protect their investments and properties in this country, they would have to go further and do a better cloaking job than they had done in World War I. Meetings and discussions were had from time to time in Germany by Farben and German officials about cloaking.

Cloaking operations had long been the practice of Farben as is shown by the foregoing cloaking of GDC stock. At first, it may have been engaged in for tax and foreign exchange reasons. As war became imminent, its purpose was to protect its properties in foreign countries from seizure in case of war by concealing its interests in property abroad. This became the official policy of the German government on September 28, 1938.

On that date, when Germany invaded Sudetenland, the German Minister of Economic Affairs issued a decree to the German Collectors of Internal Revenue, authorizing the cloaking of German firms abroad as follows:

Within the last few days applications were submitted to me concerning assignments or transfers to neutral trustees of German assets located in countries which in case of war may be expected to be enemy territory.

Since it is not possible to predict the development of the international situation with certainty, I authorize you herewith to grant such applications subject to the following directives: The transfer of assets (stock, shares, share certificates, export claims, stocks of goods, etc.) to residents of countries which may be expected to remain neutral may be authorized for each individual if a reassignment to the German owner remains possible at all times (p. 2). Of course, licenses may only be issued to reliable German firms, which may be trusted not to avail themselves under any circumstances of this opportunity to transfer property illegally to foreign countries or to leave their foreign assets abroad for periods longer than is usual. To illustrate, the assignment of export claims must not result in having the proceeds delivered to the Reichsbank at a date later than is usual, except for unavoidable delays such as in the case, e. g., of an export claim against England which is collected from Zurich and then remitted from there to Berlin.

In issuing licenses it shall be stated explicitly that they are issued as an "exception" and that, also in the interest of the applicant, strict secrecy must be observed toward any individual not concerned with such measures.

The issuance of the licenses does in no way imply that I am convinced that such measures are necessary at the present moment. On the other hand,

I, for my part, do not want to be responsible for the loss of German assets which certain firms by utilizing their business connections might be able to safeguard a loss which might be incurred as a result of the denial of such applications if and when contrary to expectations international complications should arise. I further request to handle the issuance of licenses (p. 3) in such a way that the firms will not gain the impression that the Reich Minister of Economics considers such measures necessary.

By Order

(sgd. L(andwehr) (sgd.) M(ueller)

September 24

[Tr. 2038-39-40—Deft's Ex. 146.]

Dr. Gustav Schlotterer, a high official of the Reich Ministry of Economics, beginning in 1935 and at all times relevant to this case, testified that the above decree was issued because there was a danger of war as early as September 1938, and that firms and individuals approached his ministry who wanted something done toward protecting German assets and firms located abroad. When asked:

"Was I. G. Farben one of these firms?"

His answer was:

"Yes." [Tr. 2032]

He further testified that in 1938 or early 1939, Farben had applied for permission to cloak General Aniline & Film (GAF). When asked whether at that time Farben officials had discussed GDC, he quoted them as saying:

We cannot operate with a company in America which shows German ownership. We must operate with Americans for the reason of the current boycott of the German firms and German merchandise.

He said further:

Whether an application was made, I cannot remember. I have the feeling that rather this had happened previously. [Tr. 2036.]

In describing what was meant by cloaking, he said:

That a German firm operating abroad does not appear on the outside as a German firm but as a Swiss firm, a Dutch firm, an English firm or an American firm, depending on the location. In other words, that the German owner or shareholder or partner disappears from the register and his place is taken by a foreign person or firm as owner or part-owner, or shareholder. [Tr. 2033.]

He further testified that the person who takes the share is described as a "confidant" or a "trustee." He further described cloaking as meaning:

Putting assets in foreign countries into the names of trustees who would act for I. G. Farben in this case or any other Germany [sic] company, as trustees always act, *having legal title but the beneficial ownership would be in the I. G. Farben, * * *.* [Emphasis supplied.] [Tr. 2065.]

He also asserted that the Ministry of Economics, in cloaking operations, always stressed the importance of making sure that the original rights would be reinstated and that corresponding agreements would be made, and assurances to that effect were required of the firms involved. Most of the assurances were oral, because the firms insisted on protecting their "partners" abroad from any sort of danger, and one danger was that any written document might come to light and show that their trustees abroad had lied. For these reasons, *strictly legal ties were cut* and oral secret agreements were relied on for the return to previous conditions after the end of the war. [See Tr. 2111-2116.] He pointed out that American citizens in America would qualify as trustees for German firms. [Tr. 2130-31.]

With further reference to the cloaking of GDC, Dr. Schlotterer testified as follows:

Q. Would you please explain it the way you wanted us to understand it?

A. The General Aniline was the subject of a written application made by I. G. Farben. I. G. Farben submitted an application to us and negotiated with us about it, in order to make a certain cloaking construction and to get our approval for it. General Dyestuff, as far as I remember, did not make such an application; in any case, not with me and I do not remember it. Generally speaking, I seem to remember more nearly that *such cloaking in that sense had already been put into effect long ago.*

Q. Then, in that situation, no specific application would have been required, is that correct?

A. Yes. In the case of General Aniline, the intent was to cloak a firm, whereas, *in the case of General Dyestuff, so far as I remember, such cloaking had already been carried out.* [Emphasis supplied.] [Tr. 2061–62.]

He testified further along this line as follows:

* * * I do not remember having heard anything about I. G. Farben making an application with regard to General Dyestuff dealing with options or changes or cloaking, and *in the course of the year 1939, I did not hear anything about any changes.* In considering myself as the agency within the Reich Ministry of Economic giving authorizations, the General Dyestuff did not exist for me in that capacity. * * * [A]nd I know only that *in 1938 or 1939, they had told me once or on some occasion that this is a company that we dominate.* What I mean is that I was not approached for any licenses or anything of that nature. [Emphasis supplied.] [Tr. 2136–37]

Dr. Schlotterer said that just prior to and at the time of the war, the greatest need of the German government in foreign funds was in English pounds and American dollars. [Tr. 2017.] These were obtained through German exports.

Consequently, German-controlled *sales* companies in foreign countries were of the utmost importance. Consequently, it was the policy of the Reich not to allow the sale of such sales companies. [GDC was a German-controlled sales company.] [See Tr. 2094, 2098.] He distinguished between investments abroad and sales organizations that produced foreign exchange. He testified generally that *no sales organization was ever liquidated.* [Tr. 2096.] When asked specifically about Farben, we find the following testimony:

Q. To your knowledge, Dr. Schlotterer, did I. G. Farben ever liquidate any one of its foreign sales organizations?

A. *I never heard of such thing.* [Emphasis supplied.] [Tr. 2097.]

He further testified that if firms like Farben wanted to liquidate one of its companies abroad in 1938 and 1939, it was not given a free hand, *but would have to apply for a license* like General Aniline did. [Tr. 2081–82.] Furthermore, in case of a sale or liquidation of assets, including options, the proceeds had to be surrendered to the Reichsbank. [Tr. 2108.] He further declared that *no cloaked participation of Farben was ever liquidated or sold outright once it had been cloaked.* [Tr. 2109.] He pointed out that an outright sale was a liquidation, but that selling had nothing to do with cloaking, saying:

* * * When you cloak, you do not sell and when you sell, you do not cloak. [Tr. 2065.]

In commenting on the opposition of the Reich Foreign Organization to cloaking, he said in a signed statement dated December 8, 1948:

* * * * * *

The objections of the Foreign Organization were met by the argument that cloakings which were well-contrived and prepared long beforehand, would not necessarily come to light. The I. G., [Farben] of all firms, had pointed out that the middlemen were trustworthy old business friends of the

I. G. *and would stick to the agreements even without any legally binding contracts.* \* \* \* [Emphasis supplied.] [Tr. 2063, 2098–99—Deft's Ex. 163 at 16.]

Dr. Schlotterer was asked questions about information contained in the official files of the Revenue Service of the German government about GDC, which was exhibited to him at the trial, and which was dated July 14, 1939, he said:

It states here that *the shares are secure in the hands through option agreements.* Then it says *the shares are being held by people who are in the confidence of the I. G. This would make this company under control and domination of I. G. Farben,* under the legal aspects of the situation prevailing at that time and according to that, it should have been registered as a foreign company being controlled by a German Company. [Emphasis supplied.] [Tr. 2024–25, 2031–32—Deft's Ex. 107.]

He was asked the further question that assuming the facts stated in the report to be true, did they not indicate that Farben exercised perhaps some *economic influence* over GDC *but did not exercise management control or ownership of that corporation?* He answered:

I see only from the report that it says in here that the shares are *safeguarded by ownership agreements* and that *the shares are held by confidants of the "I. G." and that the shareholders of the General Dyestuff administer the shares in the interest of I. G. Farben.* That is what it says here. [Emphasis supplied.] [Tr. 2126.]

Schlotterer was interrogated about another undated report of the German Revenue Office concerning GDC. He was asked, assuming the information in the report was on file in the Revenue Office as was indicated by the report, would GDC have to be registered with the Reichsbank as an asset of I. G. Farben? He said:

Yes, but here it says that *all participation is surely in the hands of the I.*

*G. Farben through option contracts. This would be considered as dominated by I. G. Farben, and an option is an asset* and I would say, I believe that if it is true what is said here, then this firm would be subject to registration with the Reichsbank. [Emphasis supplied.] [Tr. 2022–23—Deft's Ex. 108.]

The decree of the Reich Ministry of Economics of September 28, 1938, authorizing the cloaking of German firms abroad, quoted above, was cancelled on October 12, 1938, except for individual meritorious cases. As to them, it was kept in force. This cancellation was due to the Munich agreement allowing the Germans to keep Sudetenland which they had invaded and conquered. [Tr. 2039 —Deft's Ex. 148.] This cancellation, except for individual exceptional cases, remained in effect until September 9, 1939, when it was reissued in more detailed form, as will be shown below. But individual cloakings were allowed between October 12, 1938, and September 9, 1938. [*See* Tr. 2041.]

The Book of Participation of Farben was introduced at the trial of this case. This important evidence showed the ownership and control of Farben's companies around the world. This book showed that GDC was a 100 percent Farben-owned consortial participation. This meant that all of the stock was held in the name of trustees for the benefit of Farben. [Deft's Ex. 168, Item 311—Tr. 2163, 2274–75, 2303, 2342–44.] This was a highly secret book that was kept by the Central Committee of Farben's Managing Board of Directors and was stored in a special container at night. It was dated December 1938, and was constantly kept up-to-date with pen and ink notations. This record was devastating to plaintiffs' case, and, in my opinion, was not given the weight and consideration by the court that it required. The plaintiffs argued that it was not kept up-to-date. This is too slender a reed upon which to dismiss such important evidence. The witness Hans Piotrowski testified he kept the book up to date

with handwritten entries until August 1939. [Tr. 2152.] When Piotrowski went into the army at that time, the book was kept up-to-date by one Willi Dagne according to the witness Hoyer. [Tr. 2268.] Changes were made in pen and ink and when a new edition was issued, the changes would appear in typed form. Hoyer testified that if changes had been made in GDC stock, they would have been noted in the book. The evidence shows that the book was kept up-to-date through November 1939, because in that month American I. G. Chemical Corporation merged with its subsidiaries and its name was changed to GAF, and this change is shown by an entry in this book. [Deft's Ex. 168, Item 310.] As can be seen, the effect of this evidence is to show that GDC was in the hands of Farben's trustee in December 1938, and that this state of affairs continued without change until at least November 1939, which was long after Halbach acquired legal title to a majority of GDC's stock on August 1, 1939. In other words, it shows that even after Halbach bought his stock on that date, he was holding the beneficial ownership for Farben, even though Farben's alter ego, the Chemnyco, had professed to cancel its options running to Farben on or about August 1, 1939, as will be shown below.

In the meantime, in April 1939, a newcomer, Dr. Armin V. St. George, joined Halbach's group by buying 160 shares of Chemnyco stock, which was the controlling interest in the company. He later sold these shares to the officers and directors of the company. However, he later bought shares of GDC at the invitation of Halbach, and his heirs are plaintiffs herein.

In June 1938, the Marion Company exercised its option on the GDC shares of Adolph Kuttroff, deceased, and sold them to Walter Duisberg, a son of one of Farben's founders, and Halbach. Halbach's shares were subject to the option of Marion, and Duisberg, who as a new shareholder, signed an option agreement with Chemnyco on June 9, 1938.

On June 1, 1939, a voting trust agreement was signed by Halbach and the other stockholders of GDC which provided that D. A. Schmitz, the nominee of Farben as to his controlling 4,100 shares, Duisberg and Halbach would be the voting trustees. This agreement, although signed, never became effective. It is significant only because it was signed.

Farben made use of trusted representatives or men of confidence called *vertrauensmann* to carry on its work. This is shown by finding 33 as follows:

33. In its business activities abroad, Farben made widespread use of trusted representatives or so-called men of confidence. In the German language, the word *vertrauensmann* is used to describe such a trusted representative. Farben had many such trusted representatives in this country upon whom it could rely to protect Farben's United States business interests. Prominent among them were H. A. Metz, first president and majority stockholder of GDC; Wilfrid Greif, Farben's official United States representative until 1936; D. A. Schmitz, brother of Farben's highest official, see finding 22; Walter Duisberg, son of a Farben founder; William vom Rath, likewise the son of a Farben founder; Rudolph Ilgner, nephew of Hermann and D. A. Schmitz and brother of the head of Farben's Central Finance Office; and finally, but most importantly from the standpoint of this litigation, Ernest K. Halbach, who in 1930 became GDC's president and in 1939 its majority stockholder.

With the rapidly developing signs of an approaching war, Farben's GDC stock nominee, D. A. Schmitz, and its other *vertrauensmann* Rudolph Hutz, W. P. Pickhardt, and E. K. Halbach, together with Chemnyco and Farben, in my opinion, decided on the final and ultimate cloaking act with reference to GDC. This plan was for Schmitz to convey legal title to his 4,100 shares to the GDC corporation, Hutz would convey 500 shares to it, and Pickhardt 300 shares,

for $100 per share. (The shares had a book value of at least four times that amount.) This was done on or about August 1, 1939. At the same time, Chemnyco cancelled its options on all the stock without consideration, which meant that it gave up its right to purchase for $600,000 stock having a book value in excess of $2,850,000 without receiving anything for it. This whole transaction can truly be said to have a "piscatorial odor." Businessmen in their right minds, and more especially astute and knowledgeable Germans, such as we have here, would not enter into a deal of this kind and throw away two and one-fourth million dollars in the book value of the stock, to say nothing of its actual value, without some promise or agreement to recover it sometime in the future.

When GDC received this stock, it sold 1,200 shares to Halbach, 900 shares to Duisberg, and 100 shares each to GDC's employees Rudolph Lenz, H. Walford Martin, and Percy Kuttroff, keeping 2,-000 shares in the GDC treasury. The shares were sold for $100 each. After this transaction, Halbach had 2,100 shares, was president, and was the majority shareholder. He had absolute power to control the company. All the shares were taken out of the hands of Farben's escrow holders and delivered to the purchasers.

No application was made by Farben to the German Ministry of Economics to make this sale and no permission was given to it by such Ministry to dispose of these shares or to cancel the options held by Chemnyco for the benefit of Farben. This was required by German law if this was a bona fide sale and cancellation of the Farben options and all of its beneficial interest in GDC. If the transaction was merely additional cloaking of the already cloaked GDC by the addition of the "ultimate" act in the cloaking process, namely, the cutting off of all outward legal ties, without disturbing the beneficial ownership, which I think was the case, it is conceivable that no permit was required. This was true because the company had long ago been cloaked by Farben, as shown above.

During the summer of 1939, Duisberg was consulting with Farben in Germany and was in contact with D. A. Schmitz by telephone. There is no doubt in my mind but the foregoing plan to transfer control to Halbach, etc., was concocted by him and Farben while he was in Europe. Hutz was also in Germany at this time. Consequently, the sale of GDC stock to Duisberg and Hutz was not completed until September and November 1939, respectively, although Halbach and the others had made their purchases on August 1, 1939.

As a part of the transaction in which Halbach gained control of the company, as described above, he and all of the other stockholders were required to sign a stockholder's agreement, dated July 27, 1939, which granted GDC an option to buy at $100 per share plus six percent interest from the date of the last dividend, all the shares of any stockholder who desired to sell, or who died, or who ceased to be an employee, director or officer of GDC. This was signed by all the stockholders, including three employees not listed above named Lennart Swenson, Anthony T. Wingender, and J. Robert Bonnar, each of whom bought 10 shares for $100 per share, and including Dr. St. George, Henry E. Herrmann, an employee who bought 20 shares in January 1941, and George A. LaVallee, a nonemployee who bought 50 shares in December 1941, and who became a director of GDC. Duisberg and Dr. St. George were excused from certain provisions of the agreement, since they were not employees, officers, or directors of GDC and by special agreement were allowed to keep their shares until death or until they decided to sell, at which time the option in favor of GDC would become operative. Next to Halbach, Duisberg owned the largest number of shares after these transactions were completed. There were two stock dividends in 1940 and 1941 which increased the shares of each stockholder by two and one-fourth times, approximately. After these divi-

dends, Duisberg owned 2,475 shares. He sold 500 shares to GDC in August 1941, and offered to sell the rest in December 1941, but the Treasury blocked the sale. GDC was willing to purchase the shares.

At the trial, the witness, Karl F. Milde, Assistant Treasurer of GAF, testified that in the original planning of the 1939 transactions, Schmitz intended to transfer the controlling interest in GDC to Duisberg but Halbach objected, and such control was then transferred to Halbach. This indicates, of course, that Schmitz, who was holding the shares as the nominee of Farben and for its benefit, was not as much interested in making a sale as he was in making sure that the control was placed in the hands of someone who would be responsible to Farben. Milde also testified that he and other officials of GAF assumed that Schmitz was a nominee for Farben and that a similar nomineeship would continue after Halbach and Duisberg acquired Schmitz's stock, and I am convinced that it did.

When D. A. Schmitz transferred his controlling shares to Halbach and Duisberg and resigned as a director and chairman of the board of GDC, he gave as his reason that he felt there was a conflict of interest since he was president of GAF. However, this will not stand the light of day, because he had held these positions for eight years and it is not logical that he would suddenly become so ethical. On the other hand, it is obvious that he was participating in a plan, no doubt on instructions from Farben, to further cloak the shares of GDC by transferring them to a Farben *vertrauensmann,* such as Halbach, and cut all legal ties with Farben in order to make the cloaking complete. This would obviate a seizure of the shares by the United States in case of war. Furthermore, this plan would be in accord with the German government decree to be issued on September 9, 1939, the contents of which were no doubt known to Farben well in advance of that date. Farben was of such importance to Germany's economy that it was, to all intents and

purposes, a part of the government. Its officers had long conferred with the Ministry of Economics about cloaking activities, and it is logical to assume that it knew of the impending decree before it was issued. If it could transfer the GDC shares before the issuance of the decree, it could always argue, as the plaintiffs do here, that the transfer was not made in compliance with the decree. This line of reasoning has been effective because the commissioner found that the decree was prospective in its application and did not apply to the transfer of Schmitz's stock to Halbach, et al. However, the transfer to Duisberg was not made until September 1939, and that to Hutz in November 1939. So it could be said that the whole transaction took place about the time the September 9, 1939, decree was issued. That decree was issued when Germany invaded Poland, and it was assumed that another World War would ensue. It was urgent that German properties abroad be fully cloaked to prevent their seizure by foreign governments, and at this point in time this could only be done by cutting all legal ties with companies abroad. The September 9, 1939, top secret cloaking decree was as follows:

In view of the present international situation, it will be necessary that companies and enterprises abroad which, in accordance with the provisions of RE ((General Order)) 152/36, are subject to German Foreign Exchange Control, be cloaked. It is a matter of urgent concern that these companies be seasonably and effectively cloaked so that they will be able to continue to serve, so far as possible, as strongpoints of German trade. The transformation which these companies will have to undergo will be made for the ultimate purpose of giving them the appearance of *foreign enterprises whose independence can be conclusively shown.* It must be expected that companies unable to prove their independence from Germany will encounter difficulties and be unable to fulfill their functions. In many cases it will

therefore be advisable to abandon pre-existing, formalized, legal ties with their German parent companies if the parent's *actual* control, ensured by other means, remains strong enough to safeguard its interests. Accordingly, it seems inadvisable to exercise control directly through foreign trustees who, e. g., hold a majority of shares in trust for a German company because of the danger that the trustee will be questioned under oath about the nature of his interest in this property.

\* \* \* \* \* \*

The actual influence upon the foreign firm established as a result of the transformation will be secured by effective safeguards both with respect to the personnel and in the economic sphere. Accordingly, special attention will be paid to the *selection of individuals* for appointment as managers of these foreign firms. It is appropriate that this selection of personnel, which as a rule will be of foreign nationality, should be left to the discretion of the German firms. I request, however, that in each case you emphatically advise the firms that they will be held responsible if a poor choice on their part should result in prejudice not only to their own interests but also to those of the German national and war economies. Of course, the companies are required to see to it that no *Jewish* foreigner be employed by any German firm that is to be cloaked.

\* \* \* \* \* \*

The cloaked firms are also subject to the provisions of RE ((General Order)) 152/36 to the extent that the *German parent*-company actually continues to be in a position to exercise control over the assets of the foreign company. This actual control is to be ensured by selection of personnel and so far as possible is to be reinforced by the actual arrangements pursuant to which business is done with the foreign company. *I attach the greatest importance to the request that shipments be billed in such form that the payment for goods exported will be received* in full at the earliest usual date; and that value for goods imported into Germany be paid in the customary manner. Any manipulation of trade transactions for the purpose of accumulating, in a foreign company, profits which are not required for its operation will be prosecuted as *economic sabotage.* \* \* \* [Emphasis in original.]

It will be noted that the decree emphasized that in many cases it would be advisable *to abandon pre-existing, formalized leagl ties* with their German parent companies, *if the parent's actual control, ensured by other means,* remains strong enough to safeguard its interests. It is also of particular interest that the decree provided:

Accordingly, it seems inadvisable to exercise control directly through foreign trustees who, e. g., hold a majority of shares in trust for a German company because of the danger that the trustee will be questioned under oath about the nature of his interest in this property.

The transaction between Halbach, et al., and Farben's nominee, Schmitz, and Chemnyco (under option to Farben) from August 1 to November 1939, complied with the provisions of this decree one hundred percent. It would be difficult to state how such compliance could have been any more complete.

A letter from Farben to the Reich Ministry of Economics dated in November 1939, showed how the cloaking operation was working, as follows:

In individual cases there are persons in our service who possess the citizenship of an enemy country. In many cases the gentlemen concerned are Germans by birth who, having worked for many years abroad, have acquired a foreign citizenship. *As you know, the setup of our sales companies located abroad is so arranged as to make them appear to be national enterprises of the countries concerned. Trusted persons acting in a fiduciary capacity appear officially as the capital holders.*

*In some cases these are gentlemen who possess a foreign citizenship. For the purpose of making the cloaking of these companies complete, we have attached special importance to entrusting such gentlemen with this function.* These gentlemen are to continue to act for us in neutral countries in the interest of our export trade. Separation from them would not only mean a not inconsiderable setback for our export trade, but it would also be dangerous in the present situation to dismiss these gentlemen who are familiar with the structure of our sales organization, since this would expose us to the risk that they might employ their knowledge to our disadvantage. We explicitly emphasize that we shall, of course, retain in our service only such gentlemen possessing a foreign citizenship whose reliability is beyond doubt. [Emphasis supplied.]

The italicized portions of the above letter are especially significant. They describe the GDC situation perfectly. If they had mentioned GDC as the company involved and Halbach and Duisberg as the "trusted persons acting in a fiduciary capacity" who "appear officially as the capital holders" and who had been entrusted with this function "for the purpose of making the cloaking of [this company] * * * complete," they would have described the GDC cloaking procedure used in this case with perfect exactness. I think we are justified in inferring that Farben was referring to the cloaking of GDC, as well as other companies, and to Halbach and Duisberg and others as its trusted representatives, who, although having legal title to the stock, were acting in a fiduciary capacity and holding it for Farben.

The commissioner correctly concluded that Farben had the beneficial ownership of GDC prior to the transfer of the controlling shares to Halbach on August 1, 1939. In this connection, he said:

There can be little doubt at this point in time that Farben continued to have the power to take direct control of GDC whenever Farben's management might desire to do so.

At oral argument of this case, plaintiff's counsel, for all practical purposes, admitted that GDC was being held by trustees for Farben's benefit up to December 1938, as shown by Farben's secret book of participation. He, of course, argued that the book was not kept up-to-date after that date and the situation changed when Halbach got control on August 1, 1939. The commissioner has sustained him in this argument. I do not agree. The evidence shows the book of participation was kept up-to-date at least until November 1939, and no change was shown as to GDC or as to Farben's beneficial ownership of its stock up to that date, as shown above.

In order for the GDC cloaking plan to work after Halbach got control, there had to be a secret agreement between Farben and Halbach that he would return the control of the company to Farben after the war. The plaintiffs say there is no evidence, written or otherwise, of such an agreement. Of course, in this kind of a cloaking operation, there would never be any written document containing the agreement, as secrecy is the cornerstone of the plan. The principal actors who made such an agreement would not likely reveal it, and in this case they were all dead at the time of trial. In this situation, a court is justified in looking to the facts to determine whether the existence of such an agreement can be established by inference. In my opinion, the principal facts in this case compel the inference that such a secret agreement did exist.

The plaintiffs argue that Halbach would not make such an agreement because he was a loyal American citizen. His loyalty has nothing to do with it. H. A. Metz had been a member of Congress and was a loyal citizen during World War I, yet he returned APC-seized property to the Germans after the war, even though Germany lost the war. In Halbach's case, any loyalty to the United States would not have kept him from

returning the control of GDC to Farben whether Germany won or lost the war. However, if Germany had won World War II, it is inconceivable that Halbach could have resisted the pressure from Farben to return its property, regardless of his loyalty to the United States. To demonstrate his loyalty to the United States, the plaintiffs emphasize his high position with the War Production Board as if he were a member of that Board. Actually, he was only a member of an *advisory committee* to the Dye and Textile Branch of the War Production Board. After all, he was an American citizen and the least that he could do in time of war was to serve on an advisory committee in an industry to which he had devoted his entire life and in which he was an expert. This did not interfere with his role in Farben's cloaking activities with respect to GDC.

Halbach was not nearly the paragon of virtue and forthrightness that the plaintiffs have pictured him. The art of concealment, both in business as well as in his private affairs, seem to have been his specialty. This is shown by his participation in the cloaking of GDC for Farben from the founding of the company in 1926 up through December 1938, by admission of the plaintiffs, and up to August 1, 1939, as found by the commissioner, and up to the time of vesting in 1942, in my opinion. During all this time he secretly held the beneficial control, along with others, of the company as a trustee for Farben. In addition, he held stock in Consolidated Dyestuffs Corporation, Ltd. (CDC), a Canadian corporation, as the nominee of Farben. The commissioner found that CDC "was always owned or controlled by Farben." The commissioner further found:

> * * * There is little doubt that Halbach was aware of the Farben arrangements to conceal its control of CDC. * * *

Halbach also applied the practice of concealment to his personal income tax returns. Beginning in 1934, he listed his salary in his income tax returns and then listed a separate item as "Income from foreign interests" which ranged upward from $30,000 in 1934 to $47,500 in 1941. His base salary from GDC was $52,500 in 1941. When questioned about this, he said that the Revenue Act of 1934 authorized the Internal Revenue Service to make public the compensation of corporate executives and he did not want the public to know how much he was making. The facts do not show whether or not he was also concealing the amount of his bonus payments each year from his other officers and stockholders. It is somewhat significant that the next highest bonus paid was only $2,500. The commissioner found:

> It was clearly improper for Halbach thus to disguise his GDC annual bonus to the end that, for purposes of public disclosure, his total GDC compensation would appear less than it actually was.
> * * *

His actions in this regard were not only improper, but also circumvented and violated the law by his filing income tax returns that contained false statements regarding the source of his income, to say nothing of causing the non-observance of the 1934 Act relating to public disclosure of income by the IRS. Of course, Halbach's actions in this regard do not govern the outcome of the case before us and is only mentioned to show the lengths to which he would go, and did go, in cloaking and concealment activities if his purpose was thereby served.

Halbach showed his willingness to serve Farben, and perhaps Germany itself, by making a trip to Milan in January 1940. He was asked to make the trip by Koehler and von Szilvinyi, who were high officials of Farben. Hallbach said later that he met with these officials of Farben for six days (January 22–28) for the purpose of planning how they could break the British Blockade of Germany by shipping goods from that country to the United States via Siberia. Plans were perfected along this line at

the meeting. Also, a secret code was agreed upon whereby Farben and Halbach could communicate with each other in secret. Here we have concealment again, which was of course no stranger to Halbach. Of course, Halbach was aiding Germany's economy by this plan to help its export program and break the British Blockade. Also, this meeting was held and these plans were made at a time when Germany had invaded Sudetenland and Poland and was in the process of exterminating millions of Jews as Auschwitz and millions more at Dachau, Buchenwald, Stalag, and other Nazi concentration camps in Germany, Austria, and Poland.[1] These events did not deter Halbach in his efforts to aid Germany's export program and thereby provide it with much needed foreign exchange, which would, in turn, assist it in its program of invasion, conquest, and war.

In my opinion, the transfer of control of GDC to Halbach on August 1, 1939, and the other transactions which occurred on or about the same time did not change Farben's beneficial ownership of the company. All that was changed was the transfer of the legal title to the stock to the extent of $100 per share plus six percent interest, together with the method by which Farben could later regain control. Of course, Halbach was the key to the whole situation. By reason of the GDC stockholder's agreements, he could take over all the stock of the employees at any time by firing them, although he did not need their stock for control, as he already had control. He could transfer this control to Farben at any time. The stock of the non-employees could be acquired if they died or wished to sell. His own stock, before and after the creation of his family trust, was subject to the agreement. He was still in control of the company after the trust was created. The trial commissioner found "There can be no question on this record that, even after the creation of the family trust, Halbach, continued to exercise *de facto* control of GDC." The net effect of the whole arrangement was simply a transfer of Chemnyco's options, which it held for Farben, to GDC, which was controlled by Halbach, and then to Halbach, to hold for Farben. Farben gambled on Halbach's loyalty to it, as shown by the fact that he had never done anything against its interests, not to mention his trusteeship of his GDC stock for Farben's benefit since the company was founded, and other services. It also counted on Halbach's living until the war was over. Of course, Halbach was in the enviable position of "having his cake and eating it, too." If Germany won the war, he could simply return the control of GDC, be reimbursed at $100 per share plus six percent, and occupy a high place in Farben's hierarchy. If Germany lost the war, which it did, he could, along with his associates, claim ownership of the legal title to the shares at $100 per share plus six percent, as well as the beneficial ownership of the company (worth $2,250,000 when he acquired control) which beneficial ownership they neither bought nor paid for, and which is exactly what they are doing in this case.

Much has been said by the plaintiffs about two stock dividends declared after Halbach got control as indicating that he and the other stockholders had complete legal and beneficial control of the company. I do not believe this proves anything one way or the other. This was a normal practice for a profitable business. It reduced the surplus of the

1. I. G. Farben was a full partner of Hitler in the program to liquidate the Jews. It developed the Zyklon-B crystals which produced the deadly gas used in the gas chambers to exterminate millions of human beings. Its participation in this program of mass murder was deliberate, calculated, and intentional, as shown by the foregoing and by the fact that it planned and constructed a chemical plant near the infamous camp at Auschwitz for the specific purpose of using slave labor as long as the victims were able to work. See "The Rise and Fall of the Third Reich" (1960) by William L. Shirer at 664–65, 968, 972; and "The Tragedy of Nazi Germany" (1969) by Peter Phillips at 161–63.

company. If this surplus had been allowed to accumulate without dividends, it would have looked like a suspicious build-up for Farben, and this is the last thing Halbach and Farben wanted. Of course, Halbach may have gone further in issuing the dividends than Farben desired, and in so doing may have operated "fast and loose" with Farben's property, but, after all, Farben had put him in charge and he had a certain amount of authority. At that point, Farben could not do anything about it without revealing the complete GDC cloaking scheme. The evidence shows that the interest of the stockholders increased $2\frac{1}{4}$ times by these stock dividends. This only meant that they would eventually be paid for $2\frac{1}{4}$ times more shares at $100 per share plus six percent than they would have been paid before the dividends were declared. This did not affect Farben's right to eventually control the company, even though its book value might or might not be somewhat less.

It should be remembered that after the transfer of stock of GDC in the summer of 1969, Duisberg was the second largest stockholder in the company and Dr. St. George was the third largest. If Halbach had died, these two would have controlled the company. This actually meant that Duisberg would have controlled it (for Farben) because past experiences with Dr. St. George showed that he would do whatever Halbach or Duisberg wanted him to do about GDC and Chemnyco.

On December 7, 1941, the United States was plunged into a struggle to the death with the Axis powers by reason of the murderous attack by the Japanese on Pearl Harbor. The most cunning, the most ruthless, the most powerful, the most unscrupulous of our enemies was Nazi Germany. It had built the most powerful war machine the world had ever known. With madman Hitler at its head, it was bent on world conquest, founded on invasion of other countries, murder, robbery, and extermination of whole populations. Not only did the Nazis have a powerful war machine, but also an economic warfare program such as had never been known before. A part of this economic warfare system was the world-wide cartel of Farben, of which GDC had long been an integral part. In the sphere of economic warfare, the Nazis had no peer. They were past masters at cloaking, deception, false pretense and misrepresentation. Faced with this kind of an enemy and these practices in economic warfare, the United States began to investigate all German-owned or controlled companies. In June 1942, the Secretary of the Treasury issued a document called "Administration of the Wartime Financial and Property Controls of the U. S. Government." This publication discusses in detail the methods used by the Axis powers in economic warfare. We find the following on page 30 with reference to GDC:

A much more common technique of control was the use of options. For example, the stock of General Dyestuff Corporation (organized under the laws of Delaware) was owned by two American citizens but was subject to an option held by Chemnyco, Inc., which in turn was nominally owned by American citizens, but was incorporated and functioned as a service agency for I. G. Farbenindustrie in the United States.

On June 30, 1942, Leo T. Crowley, APC issued vesting order No. 33, vesting all of the capital stock of GDC, in pertinent parts as follows:

* * * [T]he undersigned, finding upon investigation that the property hereinafter described is the property of Nationals of a Foreign Country designated in Executive Order No. 8389, as amended, as defined therein, and that the action herein taken is in the public interest, hereby directs that such property including any and all interest therein shall be and the same hereby is vested in the Alien Property Custodian, to be held, used, administered, liquidated, sold or otherwise dealt with in the interest of

and for the benefit of the United States; such property being described as follows:

All outstanding shares of the capital stock of General Dyestuff Corporation (a New York corporation), \* \* \*. [Deft's Ex. A.]

This order was never revoked or changed in any way. Later the Attorney General succeeded the APC. He consolidated GAF and GDC and sold both companies on March 9, 1965, to a group of underwriters. The plaintiffs or their respective predecessors in interest filed suit in a United States District Court for the proceeds of the sale of the GDC portion of the stock. This suit was settled in 1945 by paying each of the parties, except St. George, $100 per share plus six percent from the date of the last dividend. In 1951 a settlement was made with St. George's widow for $365 per share. The total amount of these payments was $1,041,360.

On October 22, 1962, an amendment to the Trading With the Enemy Act was enacted as Section 41(a) Pub.L. No. 88–490 (Codified in Title 50 U.S.C. App. as Section 42(a)) conferring jurisdiction on this court "Notwithstanding any statute of limitation, lapse of time, any prior decision by any court of the United States, or any compromise, release or assignment to the Alien Property Custodian" to hear, determine and render judgment against the United States for the proceeds of the sale of property vested under vesting order No. 33 relating to certificate numbers 104 to 121, inclusive, 125, 126, 128 to 134, inclusive, and 137 to 139, inclusive.[2]

Thereafter, the plaintiffs filed this suit, claiming they are the beneficial owners of GDC as well as the legal title owners of the stock for which they have already been paid. In effect, they sue here for the amount the United States received from the sale of the beneficial ownership of the GDC stock over and above the $100 per share plus six percent interest from the date of the last dividend paid to all but Mrs. St. George, who was paid $365 per share plus the six percent. She sues for the excess of such beneficial ownership above the $365 per share paid to her. Plaintiffs also claim they are entitled to interest on the total amount received by the United States from the date of the sale. The commissioner has concluded that the plaintiffs are entitled to recover $22,227,483.15, but has denied their claim for interest.

### The Law of the Case

In my opinion, there is no question but what the plaintiffs and their predecessors in title had legal title to the GDC shares of stock to the extent of $100 per share, plus six percent interest since the date of the last dividend. The plaintiffs have been paid for the legal title to this stock by the settlements heretofore made. The only property we are concerned with here is the beneficial ownership of GDC above the amounts heretofore paid, as aforesaid, which included the right to eventually control the company.

The commissioner has correctly stated that under Section 9(a) of the Trading With the Enemy Act the claimant's burden in a case to recover vested property is to show that he was not an enemy, the ally of an enemy, or the agent of either, and that he owned his property beneficially without taint, citing Societe Internationale Pour Participations Industrielles Et Commerciales v. Rogers, 357 U.S. 197, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958); von Clemm v. Smith, 255 F. Supp. 353 (S.D.N.Y.1965), aff'd, 363 F. 2d 19 (2d Cir., 1966); and Feller v. Brownell, 201 F.2d 670 (3d Cir., 1953). All parties agree that the plaintiffs have this burden in this case. The question is, have they discharged this burden?

The plaintiffs are not enemies as defined in the Act because of citizenship

---

2. It will be noted that nothing was ever paid to Duisberg when the settlement was made with the others in 1945, and his certificate number is not included in the above statute. He was not authorized to be a party to this suit in person or by his successor in interest.

or residence, as they were all Americans and resided in the United States. They were not enemies or allies of an enemy by reason of being an officer, official agent, or agency of the German government. Therefore, they cannot be denied recovery here on the ground that they were enemies as defined in the Act.

However, the plaintiffs have a long way to go in order to recover in this case. They have the burden of proving that (1) they were the beneficial owners of the company; (2) they were not holding such ownership as fiduciaries for the benefit of Farben; and (3) their ownership was not "tainted" by cloaking or other connections with Farben or Germany. If they have failed to prove the first proposition, which I think is the case, we do not have to reach the second and third.

I have demonstrated in a discussion of the facts that Farben had the beneficial ownership of GDC up to the time of vesting in 1942. Plaintiff has admitted that this was true up to December 1938. The commissioner found this to be true up to August 1, 1939, and the plaintiffs admit that they did not except to this finding and they are therefore bound by it. The sale to GDC on August 1, 1939, of the controlling shares, which were, in turn, transferred to Halbach, Duisberg, and St. George, plus the cancellation without consideration of Chemnyco's options, did not change the situation. The options were, in effect, renewed by the stockholders' agreements with GDC which Halbach controlled as a Farben *vertrauensmann* for the benefit of Farben. The evidence shows that under the laws of Germany, Farben had to apply to the Reich Ministry of Economics for permission to sell its beneficial ownership in GDC. The plaintiffs did not prove that Farben ever made such an application nor that it ever got permission for the sale, nor that it ever reported any sale as required by German law. Consequently, plaintiffs have wholly failed to discharge their burden of proving a sale of the beneficial ownership of the company.

We started out with the agreement of all parties that Farben had the beneficial ownership of GDC, as shown by the option agreements, at least up to August 1, 1939. As was stated in Feller v. McGrath, 106 F.Supp. 147, 154 (W.D. Pa.1952), aff'd sub nom. Feller v. Brownell, 201 F.2d 670 (3d Cir., 1953), cert. denied, 346 U.S. 831, 74 S.Ct. 24, 98 L.Ed. 355:

> * * * An agreement once proved is presumed to continue until the contrary is established, * * *. [*Id.* at 154.]

The plaintiffs never proved that the agreements in the options were ever really cancelled or changed in substance. They were merely transferred to GDC and ultimately to Halbach. For the plaintiffs to prevail they had to prove that the beneficial ownership was sold to them and for a consideration. This they have failed to do. All that plaintiffs have proven is that the bare legal title to the stock was sold to them, but that is not enough. Besides, they have already been paid for such bare legal title.

The case of Feller v. McGrath, *supra,* is in many respects on all fours with the case before us. There a German firm in the United States was cloaked to hide its German beneficial ownership upon the approach of war. The legal title to its shares of stock was transferred to Feller, an American citizen, who, like Halbach in our case, performed valuable services for the United States during the war. Also, there was a voting trust agreement that was never put into operation, as here. There, as here, no written agreement was made for the return of the property after the war. The company in Germany relied on Feller's inferred oral promise to return the property after the war. The court pointed out, as I have done here, that a license had to be obtained from the German government before the beneficial ownership of the company could be sold, and there was no proof that this was ever done. There was no specific evidence that an agreement to conceal the property was

ever made either in writing or verbally, but the existence of such an agreement was *inferred* fom the facts. The Court said in this regard:

> * * * There is no direct evidence that this agreement to conceal was entered into at a specific time and place, or that it was written or verbal; but the existence of *such an agreement is to be inferred* from the testimony * * * [and from the other evidence, as contracts, negotiations and circumstances]. [Emphasis supplied.] [*Id.* at 151.]

The court went on to say that even if the agreement to conceal was not established, the facts and circumstances still showed that the German company was the beneficial owner of the stock even though Feller held the legal title to it. The court pointed out that the burden was on the plaintiff to show he had the full beneficial ownership and all that he had proved was that he had bare legal title to the stock, which was not enough. That is exactly the situation here.

In my opinion, the facts are stronger for the government in our case than they were in that case. In any event, that decision is decisively against the plaintiffs here.

Accordingly, plaintiffs are not entitled to recover. *See* Manufacturers Trust Co. v. Kennedy, 291 F.2d 460 (2d Cir., 1961); La Due & Co. v. Rogers, 259 F.2d 905 (7th Cir., 1958), cert. denied, 359 U.S. 911, 79 S.Ct. 588, 3 L.Ed.2d 575 (1959); Draeger Shipping Co. v. Crowley, 55 F.Supp. 906 (S.D.N.Y.1944); and Bank of Philippine Islands v. Rogers, 108 U.S.App.D.C. 179, 281 F.2d 12 (1959), aff'g 165 F.Supp. 100 (D.D.C. 1958). It might be argued that the minority stockholders should be treated differently to Halbach and Duisberg. (Duisberg is not a party to this suit.) It is true that there is a difference between the minority stockholders and Halbach as far as knowingly participating in the cloaking of GDC for the benefit of Farben is concerned, as shown above and as will be discussed below. Never-

theless, no distinction can be made between their position and that of Halbach in connection with the beneficial ownership of the company. This is obviously true, because the facts show that the exclusive beneficial ownership was in Farben, and, consequently, it could not be in any of the plaintiffs or their predecessors at the same time.

In view of the foregoing, it is not necessary to reach the questions of whether plaintiffs were holding the beneficial ownership of GDC as fiduciaries for Farben or whether their ownership was tainted by cloaking for Farben, as indicated above. However, I have concluded that these points should be briefly discussed with reference to the Halbach claim.

The commissioner found, in effect, that Halbach and his associates were holding the beneficial ownership of GDC as fiduciaries for Farben up to August 1, 1939, when he said that up to that date Farben could have taken over the company any time it chose to do so. The plaintiffs have agreed to this fact by admittedly failing to except to this finding. Also, Farben's book of participation showed that GDC was 100 percent in the hands of its trustees in December 1938, and no changes were ever shown in the book, although the last entry was made therein in November 1939. As has been pointed out above, the transfer of the control of Schmitz, et al., to Halbach, et al., from August 1 to November 1939, and the cancellation of Farben's options by Chemnyco without any consideration, was nothing more than a further cloaking operation of the company. A requisite of this arrangement was the contemporaneous stockholders' agreements whereby Halbach could take over their shares at any time in the name of GDC for $100 per share plus six percent. He was always in a position to turn the control over to Farben. The commissioner has stated that Farben had no legal right to force Halbach to return control to it. In my opinion, this is immaterial. The ultimate act of cloaking by cutting all legal ties was in accord with Germany's

final cloaking scheme, and it did not depend on the enforcement of any legal obligations for its success. Farben had other means of assuring the return of the control of GDC to it, which, in this case, was obviously a secret agreement with Halbach. All of this being true, the conclusion is inescapable that Halbach was holding the beneficial ownership of the company as a fiduciary for the benefit of Farben. Under these circumstances, Halbach's heirs are not entitled to judgment. *See* Kaname Fujino v. Clark, 172 F.2d 384, 385 (9th Cir., 1949); Farmers' Loan & Trust Co. v. Hicks, 9 F.2d 848, 853 (2d Cir., 1925), cert. denied, 269 U.S. 583, 46 S.Ct. 120, 70 L.Ed. 424; Central Hanover Bank & Trust Co. v. Markham, 68 F.Supp. 829, 831 (S.D. N.Y.1946); Keppelmann v. Keppelmann, 91 N.J.Eq. 67, 108 A. 432 (1919), cert. denied sub nom. Keppelmann v. Palmer, 252 U.S. 581, 40 S.Ct. 392, 64 L.Ed. 727 (1920); Cordero v. Brownell, 211 F.2d 90 (2d Cir., 1954); and Feller v. McGrath, *supra*. In Keppelmann v. Palmer, *supra*, the court said:

> * * * The manifest purpose of Congress was that the statute should operate, not only upon property the legal title to which is in the alien, but on all property held for him, or for his benefit, *whether the legal title be in him or in the person who holds it for his benefit.* * * . * [Emphasis supplied.] [91 N.J.Eq. at 69, 108 A. at 433.]

The above was quoted with approval by the court in Central Hanover Bank & Trust Co. v. Markham, *supra*, 68 F.Supp. at 831. In Public Administrator of New York County v. McGrath, 104 F.Supp. 834 (S.D.N.Y.1952), the court said:

> * * * His [plaintiff's] initial contention is that his citizenship as fiduciary rather than the citizenship of the beneficiaries determines the capacity to sue. I reject the argument on the authority of Farmers Loan & Trust Co. v. Hicks, * * *; Central Hanover Bank & Trust Co. v. Markham * * *. [*Id.* at 836.]

In Cordero v. United States, 111 F. Supp. 556 (S.D.N.Y.1953), aff'd sub nom. Cordero v. Brownell, 211 F.2d 90 (2d Cir., 1954), the court held:

> Were the concern of the Trading With the Enemy Act with bare legal title, there would be merit to the plaintiff's theory. However, the language of the Act itself, particularly Sections 5(b) and 7(c), and the judicial interpretations all lead to the conclusion that the status of the beneficial owners is crucial. [Cases omitted.] As a fiduciary and nothing more, plaintiff may not recover when the persons to be benefitted by a return of the property are enemies within the Act. [Cases omitted.] [*Id.* at 558.]

Based on these authorities, it is clear that Halbach's heirs cannot recover because he was holding the beneficial ownership of GDC as a fiduciary for enemy national Farben.

Another reason why the heirs of Halbach cannot recover is the fact that he was "enemy tainted" by his participation in Farben's cloaking of GDC and by his holding the beneficial ownership of the company as a fiduciary for Farben. The commissioner has stated, and the plaintiffs have agreed, that "if their ownership was in any way 'enemy tainted' by cloaking or similar devices, they are not entitled to recover." While the defendant argues that all of the plaintiffs are enemy tainted, and there is a good deal of support in the record for such an argument, I have concluded that this opprobrium is only applicable to Halbach. The "enemy taint" doctrine was developed by the courts and was first announced by the Supreme Court in Clark v. Uebersee Finanz-Korp., 332 U.S. 480, 68 S.Ct. 174, 92 L.Ed. 88 (1947). In that case a Swiss corporation sued to recover property that had been vested by the APC under Section 5(b) of the Act. The case went to the Supreme Court on the pleadings. The court said that even though a corporation was incorporated in a neutral country and did no business in an enemy country, it might still be af-

fected by enemy taint if its stockholders were enemy nationals. Later on, the case was tried and it developed that the stock of the company was registered in the name of Fritz von Opel, a citizen of neutral Liechtenstein, but his parents who resided in Germany had the beneficial and controlling interest in the stock. The district court denied recovery to the plaintiff corporation *Uebersee* because it was tainted by the enemy status of its beneficial stockholders. Uebersee Finanz-Korp. v. Clark, 82 F.Supp. 602 (D. D.C.1949), aff'd sub nom. Uebersee Finanz-Korp. v. McGrath, 88 U.S.App.D. C. 182, 191 F.2d 327 (1951), aff'd, 343 U.S. 205, 72 S.Ct. 618, 96 L.Ed. 888 (1952). The Supreme Court said:

> * * * As construed by this Court in Clark v. Uebersee Finanz-Korp., A.G., *supra*, [332 U.S. 480, 68 S.Ct. 174, 92 L.Ed. 88] § 2 included in the word "enemy" all corporations affected with an "enemy taint." Since we find petitioner to be so affected because of the direct and indirect control and domination by an enemy national, Wilhelm von Opel, petitioner cannot recover under § 9(a). [343 U.S. at 212, 72 S.Ct. at 621.]

The enemy taint doctrine was applied to an *individual,* namely, Fritz von Opel, the registered owner of the stock in neutral Liechtenstein in the *Uebersee* cases, in yet another case which denied him recovery because he was infected with enemy taint. Uebersee Finanz-Korp. v. Brownell, 133 F.Supp. 615 (D.D.C.1955), aff'd sub nom. Von Opel v. Brownell, 100 U.S.App.D.C. 341, 244 F.2d 789 (1957), cert. denied, 355 U.S. 878, 78 S.Ct. 141, 2 L.Ed.2d 108. *See also,* Rusche v. Brownell, 136 F.Supp. 835, 845 (D.D.C. 1955), aff'd, 100 U.S.App.D.C. 334, 244 F.2d 782, 783 (1957), and von Clemm v. Smith, 255 F.Supp. 353 (S.D.N.Y.1965), aff'd, 363 F.2d 19 (2d Cir., 1966). Under this doctrine, neither a corporation nor an individual can recover vested property if infected with enemy taint.

It seems quite clear from the facts in this case, which will not be repeated again here, that Halbach was infected with enemy taint and, consequently, his heirs cannot recover in this suit.

The plaintiffs have sued for interest since the date of the sale, I do not reach that question since I would deny them any recovery on the main suit. I would also deny defendant's counterclaim for money already paid to plaintiffs, as they had bare legal title to the stock, which entitled them to the money paid to them for same.

The case has been a difficult one, especially for the government because most of the people who knew about the controlling events were dead and the transactions took place so many years ago. Under these circumstances, government counsel has done a good job. Plaintiffs have likewise been represented by able counsel who have worked diligently on the case. Both parties have filed excellent briefs that have been of great help to the court.

Based on the whole record, I would deny plaintiffs any recovery and would dismiss their petition. I would also deny defendant's counterclaim.

NICHOLS, Judge, joins in the foregoing dissenting opinion.

### APPENDIX

Pertinent provisions of Sections 2, 7 (c), 9(a), and 42(a) of the Trading With the Enemy Act, as amended, 50 U.S.C. App. § 1 et seq. Section 2 of the Trading With the Enemy Act defines an enemy as:

> (a) Any individual, partnership, or other body of individuals, of any nationality, resident within the territory (including that occupied by the military and naval forces) of any nation with which the United States is at war, or resident outside the United States and doing business within such territory, and any corporation incorporated within such territory of any nation with which the United States is at war or incorporated within any country other than the United States and doing business within such territory.

(b) The government of any nation with which the United States is at war, or any political or municipal subdivision thereof, or any officer, official, agent, or agency thereof.

(c) Such other individuals, or body or class of individuals, as may be natives, citizens, or subjects of any nation with which the United States is at war, other than citizens of the United States, wherever resident or wherever doing business, as the President, if he shall find the safety of the United States or the successful prosecution of the war shall so require, may, by proclamation, include within the term "enemy." [1]

§ 7(c) * * * The sole relief and remedy of any person having any claim to any money or other property heretofore or hereafter conveyed, transferred, assigned, delivered, or paid over to the Alien Property Custodian, or required so to be, or seized by him shall be that provided by the terms of this Act [sections 1–6, 7–39 and 41–44 of this Appendix], and in the event of sale or other disposition of such property by the Alien Property Custodian, shall be limited to and enforced against the net proceeds received therefrom and held by the Alien Property Custodian or by the Treasurer of the United States. * * *

§ 9(a) Any person not an enemy or ally of enemy claiming * * * title in any * * * property which may have been conveyed * * * to the Alien Property Custodian or seized by him hereunder * * * may file with the said custodian a notice of his claim * * *. [S]aid claimant may institute a suit in equity * * * to estab-

lish the * * * title * * * so claimed, and if so established the court shall order the * * * delivery to said claimant of the * * * property so held * * * *Provided* [2] * * * the Alien Property Custodian or any successor officer, or agency may sell such property * * * at any time prior to the entry of final judgment in such suit. * * * The net proceeds of any such sale shall be deposited in a special account established in the Treasury, and shall be held in trust by the Secretary of the Treasury pending the entry of final judgment in such suit. Any recovery of any claimant in any such suit in respect of the property * * * so sold shall be satisfied from the net proceeds of such sale unless such claimant * * * files with the court an election to waive all claims to the net proceeds * * * and to claim just compensation instead. * * *

§ 42(a) [3] Notwithstanding any statute of limitation, lapse of time, any prior decision by any court of the United States, or any compromise, release or assignment to the Alien Property Custodian, jurisdiction is hereby conferred upon the United States Court of Claims to hear, determine, and render judgment upon the claims against the United States for the proceeds received by the United States from the sale of the property vested under the provisions of the Trading With the Enemy Act * * * by vesting order numbered 33 relating to certificate numbers 104 to 121, inclusive, 125, 126, 128 to 134, inclusive, and 137 to 139, inclusive. * * *

---

1. An ally of an enemy is defined in identical terms substituting the clause "of any nation which is an ally of a nation with which the United States is at war" for "any nation with which the United States is at war."

2. Proviso added in 1962, Pub.L. No. 87–846.

3. This section was enacted on October 22, 1962, as section 41(a), Pub.L. No. 87–846, and amended August 26, 1964, Pub.L. No. 88–490. However, it was codified in Title 50 U.S.C.App. as section 42(a), and is so referred to herein.